UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

ALONZO PRICE,                                    :
                                                 :
                    Petitioner,                  :         Civ. No. 12-2238 (RBK)
                                                 :
          v.                                     :         **OPINION**
                                                 :
CHARLES WARREN, et al.,                          :
                                                 :
                    Respondent.                  :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

## I.    INTRODUCTION

Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury on multiple counts

including kidnapping, burglary, robbery, terroristic threats and unlawful possession of a weapon

amongst others.  He is currently serving a life sentence with a forty-year parole disqualifier.

Petitioner raises several claims in his habeas petition.  For the following reasons, the habeas

petition will be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

> Following a reversal and remand resulting from plain error as to
> the questioning of a discharged juror, defendant Alonzo Price was
> convicted by a jury on two counts of first-degree kidnapping; two
> counts of second-degree burglary; one count of third-degree
> burglary; two counts of first degree robbery; two counts of third-
> degree terroristic threats; one count of third-degree possession of a
> weapon for an unlawful purposes; one count of fourth-degree
> unlawful possession of a weapon; one count of theft as a disorderly
> persons offense; and one count of third-degree theft.  The court
> sentenced defendant as a persistent offender, to a discretionary
> extended term of life imprisonment with a twenty-five year parole

_____

[1] The factual background is taken from the Superior Court of New Jersey, Appellate Division
opinion on petitioner's direct appeal that was decided on November 15, 2006.  (*See* Dkt. No. 9-
8.)

disqualifier on count six (robbery of Sadie Hamer).  It also imposed a consecutive thirty-year term with a fifteen year parole disqualifier on count two (kidnapping of Mary Perez), and the following concurrent terms; thirty years with a fifteen-year parole disqualifier on count one (kidnapping of Hamer), twenty years with a ten-year parole disqualifier on count seven (armed robbery of Perez), ten years with a five-year parole disqualifier each on counts three and four (second-degree burglary of Hamer and Perez), and five years with a two-and-one-half-year parole disqualifier on count five (third-degree burglary of Perez) . . . .

The convictions arose in connection with two residential burglaries in Woodbine, which occurred one week apart, one involving Sadie Hamer on June 22, 2000, and the other involving Mary Perez on June 29, 2000.  In both instances, the women were sleeping in their bedrooms when someone broke into their respective houses, threatened them, and bound and robbed them.

Hamer testified that a man straddled her, told her not to look at him, and put something flat, sharp and cold to the right side of her neck.  She heard the sound of bedding being torn, and her assailant tied her hands behind her back and put a pillowcase over her head.  He then put what Hamer thought to be a wood handle of a knife into her side and asked where she kept her money.  Hamer heard the man open her drawers and search through her room for valuables.  He then told Hamer he was leaving, and if she screamed, he would kill her.  After she heard the front door open and close, Hamer shook the pillowcase off her head.  She then went to her son's room and woke him, and called the police.  The police untied Hamer when they arrived.  The screen to the living room window had been cut, and Hamer reported that she was missing a watch and bracelet, each estimated to be worth $50, as well as $100 in cash.

Hamer could only see her assailant's silhouette as he initially came at her and she described him as "appear[ing] to be tall."  When he had Hamer lie down, his cheeks touched hers, and she could not feel any facial hair.  She also thought he had close, short hair and had a dark complexion.

Perez testified that her attacker directed her to turn onto her stomach and straddled her on the bed.  He then placed a sharp object against her neck and told her not to move.  She heard the sound of bedding being torn, and the assailant gagged her and bound her hands behind her back.  Perez pleaded with her attacker just to take her money and jewelry, and informed him she had

money in her car.  He said that if she was lying about the money in her car, he would come back and hurt her.  The attacker left the house with Perez's car keys, which she had dropped on the living room carpet.  She was able to dislodge the gag and called the police.

While resisting the attack, Perez felt her attacker's hair and face.  She described him as "approximately five foot ten" with "African American" hair and informed the police he had been wearing a grey shirt and smelled of cigarettes.  Perez also told them she believed she recognized her attacker's voice as that of defendant, who was a customer at the pharmacy where she worked, which was located in the building underneath her apartment.  Perez reported that she was missing various pieces of jewelry and $200 taken from the wallet in her car.

A screen had been cut in Perez's living room and a cigarette butt, containing saliva that matched defendant's DNA, was located on the pharmacy roof outside Perez's window.  The police also found a ladder placed against the pharmacy building, which the attacker had apparently used to climb onto the roof and into Perez's apartment.  Detective Ulbrich testified that based on the space between the last rung of the ladder and the flat part of the roof, the attacker would have had to pull himself over the wet, wooden shingles onto the roof, which would have left dark-colored residue on his clothing.  Pursuant to a search warrant of defendant's room, the detectives seized a damp gray t-shirt with staining on the front that appeared to be residue from the shingles.  Defendant's jean shorts also contained similar staining, and in the pocket were some strands of "purplish" carpeting that were the same color as the carpet in Perez's living room.

 Detective William Scull testified as follows regarding the similarities between the two crimes:

> With respect to date and time, both, both of these crimes were in the early-morning hours on a Thursday.  They happened to be on subsequent Thursdays.  One was approximately 2:20 and one was around 3:00 a.m. . . .  And the Thursday happens to be the day after Alonzo Price's payday which he indicates on payday, on Wednesdays, he gets a bottle and gets drunk. . . . They were both within a close proximity to each other in Woodbine which also happens to be in close proximity to the defendant's apartment.

> They were both locations that were primarily
> housed by a woman . . . without the typical
> male/man/husband figure in the house as a . . .
> known thing, I believe, throughout the Town of
> Woodbine.  Woodbine's very small, and people
> know each other. . . . Both of them are known to
> primarily have residing with them a minor child.
>
> . . . .
>
> [B]oth crimes were committed via entry of a,
> screen-through a window.  Both of them happened
> to have screen windows on the outside.  Both of
> these screen windows happened to be cut in a very
> similar fashion, as they were cut right along the
> bottom of the screen.
>
> I have investigated other burglaries and such
> throughout my, my time, and I believe in my
> opinion from my experience, that it's more common
> that if a screen's taken out, either the frame's ripped
> out or the screen's ripped out.  Both of these were
> cut horizontally along the bottom.  Both of them
> had the screens lifted up, not taken from their track,
> and both of them had then subsequent entry in
> through the window.
>
> And both of these crimes had exit through the
> primary entrance door or exit door.  Both of them  .
> . . were residences that had the television on. . . .

The detective further testified that normally, to avoid
confrontation, burglars do not wake sleeping victims.  In both
instances here, however, the perpetrator initiated contact with the
victim.  Detective Scull also noticed there were other items
available to take, such as Perez's car which the attacker had the
keys to, but instead, in both instances, he took only money and
jewelry.

(Dkt. No. 9-8 at p. 2-3.)

After petitioner was convicted and sentenced at his retrial, he appealed to the Superior

Court of New Jersey, Appellate Division.  The Appellate Division affirmed except for reversing

a conviction on one count and remanding for resentencing on an issue not relevant to this Opinion.  The New Jersey Supreme Court denied certification on March 20, 2007.  (*See* Dkt. No. 9-13.)

Petitioner subsequently filed a petition for post-conviction relief ("PCR") in the Superior Court of New Jersey, Cape May County in April, 2007.  That court denied the PCR petition on January 14, 2009.  (*See* Dkt. No. 9-18.)  The Appellate Division affirmed that denial on March 8, 2011.  (*See* Dkt. No. 9-22.)  The New Jersey Supreme Court denied certification on the PCR petition on July 22, 2011.  (*See* Dkt. No. 9-25.)

Petitioner then initiated this federal proceeding by filing a petition for writ of habeas corpus in April, 2012.  Petitioner was then given the requisite notice pursuant to *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000).  He informed the Court that he wanted his petition to be ruled upon as filed.  (*See* Dkt. Nos. 2 & 3.)  The respondent filed his response on June 20, 2012.  Petitioner then filed his original traverse in September, 2012.  Subsequently, petitioner has filed numerous updates and amendments to his traverse.  He has also filed a motion to compel.

### III.   HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States.  *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also, Mason v. Myers*, 208 F.3d at 415 n.1 (citing 28 U.S.C. § 2254).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:  (1) resulted in

a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision."  *Id.* (citations omitted).  A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *See Williams v. Taylor*, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, - U.S. -, 131 S. Ct. 1388, 1398 (2011).  The petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision.  *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008).  Furthermore, "[w]here there has been one reasoned state

judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV.  DISCUSSION

Petitioner raises multiple claims in his habeas petition; specifically:

1.  The evidence did not support his conviction concerning the charges involving Sadie Hamer and did not support the kidnapping convictions as to both women.

2.  Prosecutorial misconduct by the prosecutor injecting his personal feelings into the case and by utilizing a Power Point presentation that included a "mug shot" of petitioner for the jury to see.

3.  The prosecutor elicited improper testimony when Detective Scull told the jury that Hamer informed him that perpetrator had inappropriately touched her breast such that a mistrial should have been granted.

4.  Trial court error by essentially permitting Scull to provide expert testimony "connecting the dots" between the Hamer and Perez crimes.

5.  Trial court error by failing to declare a mistrial when Ulbrich made two improper references to petitioner's prior incarceration.

6.  Trial court error in failing to suppress petitioner's statement to police.

7. Trial court should have granted petitioner's motion for a change of venue or ordered a foreign jury penal because of pre-trial publicity.

8. Trial Court error in denying petitioner's motion for recusal.

9. Ineffective assistance of counsel for failing to move to suppress the cigarette butt or make an argument to the jury based on a lack of chain of custody.

10. Ineffective assistance of counsel for failing to move to suppress the voice identification procedure.

11. The arrest warrant issued for defendant did not comply with the statutory requirements for a valid arrest warrant and counsel was ineffective for failing to suppress the evidence that followed that illegal arrest.

12. The PCR petition was improperly denied as petitioner is entitled to an evidentiary hearing.

These claims will be considered in turn.

A. <u>Claim I – Insufficiency of the Evidence</u>

Petitioner makes two arguments with respect to claiming that there was insufficient evidence to support his convictions.  First, he claims that there was insufficient evidence to support his convictions on the charges involving Sadie Hamer.  Second, he claims that there was insufficient evidence to support the kidnapping convictions.  The last reasoned decision from the state courts on this claim was from the Appellate Division on direct appeal.  That court analyzed these issues as follows:

> In deciding a motion for a judgment of acquittal, the trial judge must review the sufficiency of the evidence and determine whether the evidence is sufficient to warrant a conviction. R. 3:18-1; *State v. Reyes*, 50 N.J. 454, 458-59 (1967); *State v. Kluber*, 130 N.J. Super. 336, 341 (App. Div. 1974), *certif. denied.*, 67 N.J. 72 (1975).  The trial judge must determine whether the State has

presented sufficient evidence, viewed in its entirety, and giving the State the benefit of all its favorable testimony and reasonable inferences, to enable a jury to find the essential elements of the offense beyond a reasonable doubt. *State v. Martin*, 119 N.J. 2, 8 (1990); *State v. Reyes*, *supra*, 50 N.J. at 458-59. Here, in denying defendant's motion, the trial judge correctly concluded a rational jury could find substantial evidence of guilt of the offenses charged as to both victims, stating:

> The state has presented the direct evidence by virtue of the testimony of Mary Helen Perez that she recognized the defendant's voice, when joined with what little she could glean of the appearance of the defendant at the time of the arrest and the photograph that's been shown [and] admitted into evidence, certainly, the appearance of his hair for example.
>
> Miss Perez testified that the assailant smelled, whom she believed to be the defendant, strongly of cigarette[s]. A cigarette butt is found outside of the window which happens to contain the defendant's DNA.
>
> A pair of scissors is found in a car.
>
> The-there is a piece of carpeting found in the defendant's short pocket. And there is testimony that her keys had been lying on the floor and that there were bits of carpeting scattered throughout her room.
>
> The similarities between the details of the assault upon Miss Perez and that of the Sadie Elizabeth Hamer incident truly are striking: The hour of the night; the manner in which they were bound; the fact very nominal items were taken as opposed to, say, electronics; that the women were similarly situated that they had only a young child, a comparatively young child with them; the manner of entry; the fact that the defendant in one case didn't go to work at all; in another, the second instance, went to work an hour late; the testimony about the bicycle; his own statements about his whereabouts and his knowledge of rumors, both of

which, there was ample testimony rebutting his statement.

We find meritless defendant's argument that the trial court should have dismissed the kidnapping charges as to both victims or that there was insufficient basis to support these convictions. The record does not demonstrate that Hamer or Perez were restrained just so their assailant could commit the robbery of their respective residences, i.e., that the confinement was "merely incidental to the underlying substantive crime." *State v. La France*, 117 N.J. 583, 590 (1990).

The cases where the kidnapping charge is based on confinement focus on the enhanced risk of harm, not the duration of the confinement. *State v. Soto*, 340 N.J. Super. 47, 74 (App. Div. 2001). For a defendant to be convicted of first-degree kidnapping, as defendant was in this case, the confinement must have substantially increased the risk of harm beyond that which was inherent in the crime itself. *State v. Lyles*, 291 N.J. Super. 517, 526 (App. Div. 1996). Defendant could have stolen the items without having wakened the sleeping women, just as he was able to complete the burglary of Hamer's home without ever waking her son. Instead, he confined and threatened their lives, which presented a substantial risk of emotional distress and physical injury to the victims. Defendant appeared in each of their bedrooms in the middle of the night and awakened them, straddled them on their beds, bound their hands behind their backs and also gagged Perez, and placed a sharp object against their throats and threatened to hurt them. Moreover, there is no evidence defendant released either victim "unharmed and in a safe place prior to apprehension." N.J.S.A. 2C:13-1c(1); *State v. Johnson*, 309 N.J. Super. 237, 265 (App. Div. 1998). Defendant did not release the victims from their confinement. He left both women bound on their beds, with a pillowcase over Hamer's head and a gag in Perez's mouth. The victims, with the police, removed the material which they were bound.

(Dkt. No. 9-8 at p. 2-3.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  A petitioner raising an insufficiency of the evidence claim faces a "'very heavy burden' to overturn the jury's verdict for insufficiency of the evidence." *United States v. Root*, 585 F.3d 145, 157 (3d Cir. 2009) (citing *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).  In analyzing a sufficiency of the evidence claim, a court examines both the direct and circumstantial evidence in their totality.  *See United States v. Pavulak*, 700 F.3d 651, 668 (3d Cir. 2012) (citations omitted).

      i.    *Sadie Hamer Incident*

Petitioner's first insufficiency of the evidence claim is that there was insufficient evidence presented to establish that he was perpetrator with respect to the Hamer incident.  In analyzing this claim, the Appellate Division relied on the circumstantial similarity evidence between the Hamer incident and the Perez incident in which there was more direct evidence connecting petitioner to that crime (in the form of voice identification and forensic evidence).  Indeed, the court noted the similarity in time, the manner of entry, the items stolen, the nature of the victims and the fact that the petitioner either did not go to work or appeared for work late the next day with respect to the two incidents.  Thus, in denying this claim, the Appellate Division in effect held that the Hamer and the Perez incidents had similar modus operandi.  The Court finds that this was not an unreasonable application of clearly established federal law, because, as stated above, in analyzing a sufficiency of the evidence claim, a court needs to examine not only the direct evidence, but also the circumstantial evidence in their totality.  *See Pavulak*, 700 F.3d at 668; *see also United States v. Cobb*, 397 F. App'x 128, 135-36 (6th Cir. 2010) (denying insufficiency of the evidence claim for Huntington Bank robbery where the robbery had a similar

modus operandi to robbery of Chase Bank where DNA evidence supported the conviction);

*Dixon v. Tampki ns*, No. 12-2821, 2013 WL 1246751, at *9 (C.D. Cal. Feb. 11, 2013) ("Based

on modus-operandi evidence from Petitioner's other convictions, a rational fact finder could

have inferred that he committed the four crimes in question.") (citing *United States v. Momeni*,

991 F.2d 493, 494 (9th Cir. 1993); *United States v. Hirokawa*, 342 F. App'x 242, 248-49 (9th

Cir. 2009)); *report and recommendation adopted by*, 2013 WL 1245981 (C.D. Cal. Mar. 27,

2013).  Therefore, petitioner is not entitled to federal habeas relief on this insufficiency of the

evidence claim.

ii.    *Kidnapping Charges*

Petitioner also argues that there was insufficient evidence to find him guilty on the two

kidnapping charges.  "When assessing such claims on a petition for habeas relief from a state

conviction, the sufficiency of the evidence standard 'must be applied with explicit reference to

the substantive elements of the criminal offense as defined by state law.'"  *Robertson v. Klem*,

580 F.3d 159, 165 (3d Cir. 2009) (quoting *Jackson*, 443 U.S. at 324 n.16).  In New Jersey,

kidnapping is defined as follows:

> A person is guilty of kidnapping if he unlawfully removes another
> from his place of residence or business, or a substantial distance
> from the vicinity where he is found, or if he unlawfully confines
> another for a substantial period, with any of the following
> purposes:
>> (1) To facilitate commission of any crime or flight
>> thereafter;
>> (2) To inflict bodily injury on or to terrorize the
>> victim or another;
>> (3) To interfere with the performance of any
>> governmental or political function; or
>> (4) To permanently deprive a parent, guardian, or
>> other lawful custodian of custody of the victim.

N.J. STAT. ANN. § 2C:13-1b.  Additionally, the kidnapping statute provides that kidnapping is a first-degree offense, but that it is a crime in the second-degree if the actor releases the victim in a safe place prior to apprehension.  In this case, petitioner argues that there was insufficient evidence to sustain both the kidnapping charge in and of themselves as well as a finding of a first-degree kidnapping charge in both incidents.

In a case such as this that involves confinement, the Appellate Division noted in New Jersey that the restraint must not merely be incidental to the underlying substantive crime, but must substantially increase the risk of harm beyond that necessarily present in the crime itself.  *See State v. La France*, 117 N.J. 583, 587 (1990).  The Appellate Division then explained that the restraint in this case was not incidental because petitioner could have stolen the items without having awoken Hamer or Perez, and without threatening their lives.  Thus, it certainly increased the risk of harm beyond that necessarily present in the crime itself through petitioner's additional actions.  Additionally, as noted by the Appellate Division, petitioner did not release the victims from their confinement, but, instead, left both of them bound in their beds.  Under such circumstances, this Court finds that the Appellate Division did not unreasonable apply clearly established federal law or deny this claim based on an unreasonable determination of the facts.  Accordingly, habeas relief is not warranted on Claim I.

B. <u>Claim II – Prosecutorial Misconduct by Injecting Personal Opinion and Presenting "Mug Shot" Photo of Petitioner</u>

Petitioner makes several distinct arguments within Claim II.  First, he asserts that the prosecutor impermissibly injected his own personal opinion in his opening statement.  Second, petitioner claims that the prosecutor improperly invoked sympathy for the victims during his closing argument.  Third, petitioner asserts that the prosecutor impermissibly used a Power Point presentation.

Petitioner argued as follows in the state courts with respect to the prosecutor purportedly impermissibly injecting his personal opinion in his opening remarks to jury:

> During opening, the prosecutor injected his personal views into the matter, telling the jury about waking up with the television on, "I know myself included." He stated, "I suspect" the "worst concern" of the victims was only having a bad dream. When describing the evidence he intended to present, the prosecutor stated, "I can tell yo u that," injecting his views into the case. Nothing in the evidence supported these statements.
>
> The prosecutor improperly invited sympathy for the victims, telling the jury, "You can imagine, I suspect, some measure of fear and terror that enveloped [the victims] . . . I'm not sure any of us who have never experienced anything like that can truly understand and appreciate what a circumstance like that would create, but I suggest we all have a good idea of what she was going through at that point in time" "Whatever terror preceded that moment, I suggest to you, it just went through the roof. The absolute terror that she then was under is unimaginable." In closing, the prosecutor continued to invoke improper sympathy for the victims with the repeated use of "atrocity."

(Dkt. No. 9-3 at p. 40-41 (internal citations omitted).) Petitioner also claims that the prosecutor committed misconduct by continuing to use the word atrocities to enlist the jury to his cause without offering any evidence and that a Power Point presentation that the prosecutor used improperly included a "mug shot" of the petitioner for the jury to see. The last reasoned decision on these prosecutorial misconduct issues was from the Appellate Division on petitioner's direct appeal which analyzed them as follows:

> We find no error, let alone plain error, in the cited comments made by the prosecutor during opening and closing arguments, to which defendant did not object, which defendant now contends improperly injected the attorney's personal views into the case and improperly invited sympathy for the victims. There is no indication in the record the prosecutor's conduct in his comments, eliciting testimony from Detective Scull or in using visual aids substantially prejudiced defendant's fundamental right to have a jury evaluate the merits of his defense. *See, e.g.*, *State v. Timmendequas*, 161 N.J. 515, 575 (1999), *cert. denied*, 534 U.S.

858, 122 S. Ct. 136, 151 L. Ed. 2d 89 (2001). The State's comments did not exceed the bounds of proper argument or express a personal belief as to defendant's guilt. *See State v. Staples*, 263 N.J. Super. 602, 606-07 App. Div. 1993); *State v. Kounelis*, 258 N.J. Super. 420, 429 (App. Div.), *certif. denied*, 133 N.J. 429 (1992). Nor were any of the comments "plainly designed to impassion the jury" and to divert its attention from the facts of the case. *State v. Harvey*, 121 N.J. 407, 425 (1990), *cert. denied*, 499 U.S. 931, 111 S. Ct. 1336, 113 L. Ed. 2d 268 (1991). Moreover, the prosecutor's "striking similarities" Power Point presentation was accurate and was confined to the "evidence revealed during the trial and reasonable inferences to be drawn from the evidence." *State v. Smith*, 167 N.J. 158, 178 (2001). The presentation did not bootstrap physical evidence from the Perez incident to the Hamer incident and did not misrepresent Hamer's inability to identify defendant, although she knew him, or the lack of physical evidence tying defendant to the Hamer break in.

(Dkt. No. 9-8 at p. 6.)

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Waingright*, 477 U.S. 168, 182-83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

      i.    *Prosecutor's Opening Statement Remarks*

Petitioner's first argument is that the prosecutor improperly injected his personal views in his opening statement.  Petitioner's main complaint is with the beginning of the prosecutor's opening statement and his use of "I" within the opening statement.  The relevant portion complained of by petitioner is italicized below:

> In 2000, two women, residents of Woodbine, New Jersey, a small borough where virtually everyone is, to some degree, familiar with everyone else, these two women had their routine, ordinary lives forever changed in the most cruel and heinous manner one might imagine by this man, Alonzo Price.
>
> Exactly one week from each other, these two women independently fell victim to his cruelty.  Each had gone to bed late that night or, in one instance, just after midnight – having gone through whatever routines their lives had leading up to going to bed, they went to bed those nights with no more or less concern than any others.  Perhaps, *I suspect, maybe their worst concern, if any, might be the potential of a bad dream or nightmare of some sort*.  But beyond that, they each felt that they were comfortable and secure in the sanctity of their own home.
>
> Each of them was in bed alone and had fallen asleep with no lights in their respective homes on with the exception of the dull glow from a TV screen that was left on as they had each gone to bed.  They didn't intend to drift off to sleep as they were watching TV their respective late nights or early mornings.  *But perhaps like many of us – I know myself included – well, we oftentimes do that, nonetheless, and find ourselves sometime later waking up to the glow of the TV screen in the early morning hours*.  These two women, however, awoke under far more disturbing circumstances.
>
> Each of them found, suddenly, out of the depths of their sleep, that someone was in their bed with them.  In the case of Sadie Hamer, the woman who was the first victim of this misconduct, she had two sons in her home at that point in time and, perhaps understandably, expected when she felt that somebody had sat down on the edge of the bed beside her while she was under her covers asleep, that it was one of her sons who had, for whatever reason, gotten up and come into her room for some purpose.  She quickly realized otherwise.
>
> She was immediately instructed by a stranger – as she's shaking loose the grogginess of being awakened from a deep sleep, she

confronted a stranger instructing her, in the virtual darkness, to not scream, "Don't make a noise. Lay back and don't look at me," commanding instructions from these individual – from this individual. She followed those instructions.

When told, "Don't look at me," though in the darkness, even with the slight glow from the TV because the TV was back behind where this person was not illuminating the features of his face, she didn't know who this person was at that point in time. She, nonetheless and understandably, followed that instruction and turned her face – her head away from looking at his at the time while she lay on her back on her bed and this man then climbed on top of her.

*You can imagine, I suspect, some measure of the fear and terror that enveloped her at that point. I'm not sure any of us who have never experienced anything like that can truly understand and appreciate what a circumstance like that would create, but I suggest that we all have a good idea of what she was going through at that point in time.*

(Dkt. No. 10-6 at p. 24-25.)  The state courts determined that the prosecutor's statements during his opening statements did not so infect the trial to prejudice the defendant from receiving a fair trial.  After reviewing the record as cited above with respect to the prosecutor's opening statement, the Court concludes that the state court's denial of this claim was not an unreasonable application of clearly established federal law.  First, the prosecutor is entitled to considerable latitude to argue the evidence and reasonable inferences that can be drawn from that evidence. *See United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991).  Indeed, the evidence cited by the prosecutor was based on evidence that he intended to, and in fact did produce at trial such as, the fact that the TV was left on and the nature of the attack.  Furthermore, as noted by the Appellate Division, the prosecutor did not state his personal opinion or belief in the petitioner's guilt. *See Fahy v. Horn*, 516 F.3d 169, 203 (3d Cir. 2008) (noting that a prosecutor cannot express his personal belief in the credibility of a witness or the guilt of a defendant).  Finally, it is worth noting that the jury was specifically instructed that the prosecutor's opening statement was not

evidence, (*see* Dkt. No. 10-6 at p. 19.) and that it needed to base its decision on the evidence in the case.  (*See* Dkt. No. 10-12 at p. 5-9.)  The jury is presumed to have followed the instructions given to it by the trial judge.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Accordingly, under such circumstances, the Court finds that petitioner is not entitled to habeas relief on this prosecutorial misconduct claim.[2]

ii.     *Prosecutor's Closing Argument Remarks*

Petitioner next argues that he is entitled to habeas relief because the prosecutor invoked sympathy for the victims by repeatedly using the term "atrocity" during his closing argument. The denial of this claim by the state courts was not an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts.  Indeed, the description of the crimes as atrocities where the victims were bound, threatened with a sharp object, and the robbed was based upon the evidence presented at trial.  *Accord Lopez v. Folino*, No. 09-0975, 2012 WL 3777444, at *10 (E.D. Pa. Aug. 30, 2012) ("The prosecutor's description of the murder as an execution and Lopez as the executioner can also be argued based upon the evidence presented at trial.  The shooter fired into the victim with a handgun which was placed directly against the back of his head.").  Thus, petitioner is also not entitled to federal habeas relief with respect to this argument.

iii.    *Power Point Presentation*

---

[2] To the extent that petitioner argued that the prosecutor also committed misconduct in his opening by stating, "I can tell you that," as noted by respondent, the petitioner misquotes the prosecutor.  Indeed, the prosecutor reference to "I" was quoting what he intended Mary Perez to state during her testimony.  (*See* Dkt. No. 10-6 at p. 32-33 ("First is the voice recognition by Mary Perez that we spoke of.  And she can – will admittedly say 'Look, can I say with absolute certainty from that voice alone that it had to have been him?  No.  I mean he's who I recognize it to be but I suppose, you know, there could've been someone else of similar physical appearance and statute and – with a similar, if not, you know, altogether identical voice who was involved in this.'").)

Petitioner also objects to the prosecutor's Power Point presentation entitled, "A Tale of Two Atrocities," that was used at his trial.  Petitioner claims that the Power Point presentation improperly bootstrapped evidence from the Perez incident into the Hamer incident.  Finally, petitioner claims that the power point presentation should have been excluded because it glossed over elements of the kidnapping charges.

The last reasoned decision on the prosecution's use of the Power Point presentation was from the Appellate Division on petitioner's direct appeal.  That court found that the use of the power point presentation did not so prejudice petitioner that prevented him from having a fair trial.  (*See* Dkt. No. 9-8 at p. 6 ("There is no indication in the record the prosecutor's conduct . . . in using visual aids substantially prejudiced defendant's fundamental right to have a jury evaluate the merits of his defense.").)

This argument is not cognizable on federal habeas review to the extent petitioner asserts that the state court erred as a matter of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (stating that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions").  The due process inquiry that is applicable to this issue is whether the state court's ruling was so arbitrary or prejudicial that it rendered the trial fundamentally unfair.  *See Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (noting that to show that an evidentiary error rises to the level of a due process violation, a petitioner must show "that it was of such magnitude as to undermine the fundamental fairness of the entire trial").  The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Petitioner is not entitled to federal habeas relief on this claim.  First, petitioner's argument that he is entitled to federal habeas relief because the Power Point presentation glossed over the kidnapping charges is without merit.  Indeed, the state court instructed the jury on the elements that made up the kidnapping charges in its jury charge.  (*See* Dkt. No. 10-12 at p. 11-12.)  The jury is presumed to have followed this instruction during its deliberations.  *See Weeks*, 528 U.S. at 234.  Second, as the state court noted, the Power Point presentation did not bootstrap evidence from the Perez incident into the Hamer incident.  Indeed, the striking similarities charge had separate columns for what transpired with respect to the two crimes.  (*See* Dkt. No. 9-4 at p. 32.)  This was merely an argument that there were reasonable inferences to be made from the evidence produced at trial.  This did not make petitioner's trial fundamental unfair such that the denial of this claim was not an unreasonable application of clearly established federal law.

Finally, the use of petitioner's photo in the Power Point presentation and its subsequent use at trial does not entitle petitioner to federal habeas relief.  Respondent asserts that there is no indication that the picture itself was a "mug shot" as the picture was redacted.  The quality of the copy of the photo that respondent submitted to this Court is extremely poor.  (*See* Dkt. No. 9-4 at p. 29.)  Indeed, the copy of the photo respondent submitted is extremely blurry.  While the Court can barely make out that it is a picture of a person, beyond the silhouette, no other identifiable features of the photo are clear.  Nevertheless, the quality of the picture submitted by the respondent does not affect this Court's analysis of this Claim.  Testimony revealed at trial indicates that petitioner was wearing normal clothes and not in prison garb in the picture.  (*See* Dkt. No. 10-8 at p. 40 ("I don't remember what color his clothes were, although the photograph that you showed me would show what shirt he was wearing.").)  This is important because some courts have noted that failing to remove the reference to a prison in a photo may constitute an

error.  *See Peace v. Hendricks*, No. 03-5987, 2005 WL 3406405, at *6 (D.N.J. Dec. 12, 2005).
Thus, it appears that the photo itself was not a "mug shot" per se, but instead an "arrest photo."
*See Crawford v. United States*, No. 06-0265, 2008 WL 1775260, at *5 (W.D.N.C. Apr. 15, 2008)
(distinguishing arrest photos from mug shots as arrest photographs "did not contain references to
prison dates or incarceration.")

Respondent argues that petitioner's argument is without merit because, "[w]hile the
photograph of Petitioner, S-22, was taken at the time of Petitioner's arrest, the redacted version
of the photograph that the State of New Jersey showed to the jury did not give any indication of
that fact."  (Dkt. No. 9 at p. 42.)  While perhaps technically true, respondent's argument fails to
place into context how (in part) the photograph was discussed at trial.  Indeed, as petitioner
notes, when Detective Ulbrich was specifically questioned about the photograph, he noted that it
was taken on June 30, 2002, or the day petitioner was taken into custody.  (Dkt. No. 10-7 at p. 90
("The photo was taken when he was lodged in the county jail which was on an unrelated
issue.").)  Thus, as this Court reads petitioner's arguments, the photograph, when combined with
Ulbrich's testimony, shows that the photograph deprived him of a fair trial by the prosecutor's
actions because it introduced evidence of petitioner's prior bad character.[3]

The state court determined that the use of the Power Point presentation did not prejudice
the petitioner.  To reiterate, to grant federal habeas relief, it is not enough for this Court to find
that the state court's determination was incorrect, but rather, whether its determination was
unreasonable which is a substantially higher threshold.  *See Schriro v. Landrigan*, 550 U.S. 465,
473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410)).  The use of the photograph coupled
with Detective Ulbrich's statement that it was taken when he was placed in the jail on an

---

[3] The separate issue of whether petitioner is entitled to federal habeas relief due to Ulbrich's
statement of petitioner's "prior" incarceration is discussed *infra* Part IV.E.

unrelated issue does give rise to the potential of prejudice towards petitioner.  However, this Court notes that petitioner's identification at the time of the crimes was clearly at issue in that neither victim could visually identify the culprit, but did notice several of the culprit's features. Furthermore, in light of the deferential standard of review that this Court must apply under AEDPA to the state court's denial of this Claim, this Court finds that the state court's finding of no prejudice was not an unreasonable application of clearly established federal law.  Indeed, the evidence against petitioner included DNA and forensic evidence which tied petitioner to the Perez crime scene.  Furthermore, petitioner's voice was identified by Perez as her attacker on the night in question.  Accordingly, this Court finds that the state court's denial of this claim based on a failure to show prejudice was not an unreasonable application of clearly established federal law.  Thus, petitioner is not entitled to federal habeas relief on this claim.

C. <u>Claim III – Improper Testimony necessitated a mistrial</u>

In Claim III, petitioner argues that Detective Scull contributed to the unfair trial when he testified with respect to the Hamer incident that the perpetrator laid on top of her and inappropriately touched one of her breasts.  Petitioner notes that in his first trial that he was charged with aggravated criminal sexual assault with respect to this touching, but that the charge was dismissed without prejudice and was not part of the second trial that is relevant to this habeas action.  Petitioner claims that the trial court should have granted his motion for a mistrial which was made later on by petitioner's trial counsel during Scull's testimony.  Petitioner further claims that the trial court agreed to give a curative instruction regarding Scull's comment but none was ever given.  Relying on the New Jersey Rule of Evidence 403(b), petitioner argues that this added to the prejudice and made it more likely that the jury would use this improper reference to convict petitioner on an improper basis.

Neither the New Jersey Supreme Court nor the Appellate Division provided a reasoned decision on this claim on the merits.  Therefore, the last reasoned decision on this claim is from the trial court which denied petitioner's motion for a mistrial in light of Scull's comment.  In denying petitioner's motion for a mistrial, that court stated as follows:

> [I]n light of the fact both victims testified that they awakened in the middle of the night to find a strange man in their bedrooms who straddled them during the course of binding their arms, who put pillowcases over their heads and threatened their lives, that's, I think, compared to the touching that's been testified to far more significant conduct on the part of the defendant.  The incident as described by Detective Scull is minimal compared to that.

> Miss Hamer testified that she felt a sharp object, that she felt a wooden handle, believed that the assailant had a knife, believed that he was going to kill her.  When she initially got up and he returned, she believed she was going to be killed then.  She was so fearful of the assailant that even though she thought she heard the person leave the house, when she went into her son's room, she spoke to her son in a soft voice, not being willing to have the chance, to take the chance that the assailant would come into her son's bedroom and harm him and her.

> Miss Perez also testified about being afraid.

> I don't think it makes any difference, frankly, in light of the context, the greater context and circumstances both victims have testified to, that this piece of information was supplied to the jury.

> There's also no dispute that that's what Miss Hamer reported not just to the police but in her statement which was maintained.

> There is no particular prejudice that can inure to the defendant that Miss Hamer in the first trial did not – was not willing, I guess, to describe anything of that nature.  That was a choice that she made and the State reacted appropriately then.

> I don't believe that Detective Scull gratuitously mentioned it.  Even if he did, given the other things that Miss Hamer testified and Miss Perez testified to, it pales by comparison.

> And there's no manifest injustice in proceeding.  I'll give an instruction if counsel wants me either now or at the end of the trial.

There is nothing about that statement that is inflammatory such as to warrant a mistrial.

(Dkt. No. 10-9 at p. 67.)

At the outset, this Claim is not cognizable on federal habeas relief to the extent that it asserts that the state court erred as a matter of state law in permitting this evidence from Scull to be admitted.  *See Estelle*, 502 U.S. at 67-68 (stating that "it is not the province of a federal habeas corpus to reexamine state-court determinations of state-law questions"); *see also Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence.").  In terms of a federal due process claim, to prevail, petitioner must prove that he was deprived of fundamental elements of fairness in his criminal trial.  *See Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992)).  As previously noted, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly based on the recognition that [b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited application."  *Medina v. California*, 505 U.S. 437, 443 (1992).  "In order to satisfy due process, [petitioner's] trial must have been fair; it need not have been perfect."  *Glenn*, 743 F.3d at 407 (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)).

The trial court decided that in light of the other facts surrounding both the Hamer incident, for example, the binding and use of a sharp object to threaten her, the fact that Scull testified that the perpetrator inappropriately touched Hamer's breasts did not so prejudice the trial so as to make it fundamental unfair.  This was not an unreasonable application of clearly established federal law on whether petitioner's fundamental fairness rights were violated.  Accordingly, federal habeas relief is not warranted on this claim.

D.  Claim IV – Purported Improper Expert Testimony from Scull

In Claim IV, petitioner argues that the trial court erred by permitting Scull to provide expert testimony by allowing him to "connect the dots" between the Hamer and Perez crimes. Petitioner asserts that this connection was for the jury to make, not the detective's to make.  The last reasoned decision on this claim was from the Appellate Division on petitioner's direct appeal which analyzed this claim as follows:

> The trial court correctly overruled defendant's objection to Detective Scull's testimony "connecting the dots" between the two crimes, stating the detective was entitled to explain his decision to charge defendant for both crimes.  The similarities between the two crimes – their locations the times they were committed, the choice of victims, and the assailant's conduct before and after each of the incidents, is not "expert" testimony beyond the understanding of the average juror.  *See* N.J.R.E. 703.  Rather, it is the kind of factual testimony that a police officers would typically provide based on his or her perception of the evidence obtained in the investigation.

(Dkt. No. 9-8 at p. 6.)  Thus, the Appellate Division found that the testimony of Scull was proper as a matter of state law.  It is not the province of this Court on federal habeas review to re-examine state court determinations on state law questions.  *See Estelle*, 502 U.S. at 67-68. Therefore, petitioner is not entitled to federal habeas relief on this claim.  *Accord Stidham v. Varano*, No. 08-3216, 2009 WL 1609423, at *20 (E.D. Pa. June 9, 2009) (where state court found that witnesses did not testify as experts but rather that such lay opinion testimony was admissible as a matter of state law, federal court on habeas review must accept state court's determination as it "would be in no position even to consider whether the Superior Court correctly ruled that the testimony was admissible as a matter of state law").

E.  Claim V – Statements of Petitioner's Prior Incarceration

In Claim V, petitioner argues that the trial court erred in denying his request for a mistrial

in light of Detective Ulbrich's references to his prior incarceration.  The first occurred in

discussing petitioner's appearance on direct:

> Q:  And what were your observations of Mr. Price at the time of
> his apprehension?
> A:  He had a day's growth, a stubbly beard and his hair was unkept
> like it was a little bit long enough to, to grab.
> Q:  I show you a photo that's been marked S-22 for identification.
> Do you recognize what that photograph is?
> A:  Yes.  It's a photograph of Alonzo Price.  This was taken on
> June 30, 2002 in conjunction with him being placed in the county
> jail.
> Q:  And that was – the photo was taken with regard to his arrest for
> this occurrence?
> A:  I believe that photo was taken when he was lodged in the
> county jail which was on a unrelated issue.

(Dkt. No. 10-7 at p. 90.)  The second reference occurred later on during the direct examination of

Ulbrich when he discussed the buccal swab that was taken from petitioner; specifically:

> Q:  What is a buccal swab?  How do –
> A:  It's a –
> Q:  How do you go about –
> A:  It's a cotton swab –
> Q:  -- obtaining –
> A:  A buccal swab really is the buccal region of your mouth which
> is inside your jaw between your check and your gum.  And it's a –
> it's a process that you use a cotton swab to obtain epithelial cells,
> like, from your mouth, some skin cells from the buccal region
> that'll be used for DNA purposes that are contained within the
> saliva.  [¶]  And it's the – that's the preferred method to send in a
> DNA sample as opposed to, say, something like a blood sample.
> Q:  Directing your attention to the, to the second of those two
> envelopes, what's that?
> A:  The second envelope is marked with the same case number.
> It's A05000531, Lab. No. 14003999.  This says, "Two buccal
> swabs (saliva) taken from Alonzo Price, Sr., suspect.  Date, 1/9 of
> 2001, time 10:02 a.m. location Cape May County Jail, nurse's
> office," my name, Detective Karl Ulbrich with my badge number.
> And it contains Items 14 and 14A, KEU14 and KEU14A.

26

(Dkt. No. 10-7 at p. 94-95.)  At the close of testimony that day, petitioner's counsel moved for

mistrial arguing that these two references were unduly prejudicial.  The trial court denied the

motion for a mistrial and stated as follows:

> And, in fact, an instruction can be fashioned to be given to the jury
> tomorrow if you want or at the end of the case if you prefer to the
> effect that the officer when reading off the place where the buccal
> swab was taken made reference to the nurse's office at the county
> jail, and that is because that's where the buccal swabs are taken in
> Cape May County Prosecutor's Office cases and leave it at that.
>
> So there just is – the first comment, honestly, this officer has a
> tendency to mumble.  It's almost as if he has marbles in his mouth,
> and I had difficulty following his testimony and just barely heard
> the comment.
>
> I'll make – I'll fashion an instruction, review any you can propose,
> gladly give it to the jury if you want.  I really don't have a concern
> that the jury could possibly have heard what he said or understand
> what it meant if they did.  But I extend to you the opportunity to
> give me an instruction.
>
> The jail reference, I do feel obliged to address.  I think that can be
> done very readily.  And I don't think any prejudice in this case
> flows from either situation in a case where the charges include two
> first-degree kidnappings and two burglaries.  Obviously, the
> defendant's going to be processed.  The county resources are going
> to be involved in the investigation of the case.  And I think we can
> just leave it at that.
>
> There is no, in my opinion, undue prejudice flowing from these.
> Obviously, it would have been cleaner if they hadn't but they
> didn't.

(Dkt. No. 10-7 at p. 99-100.)  The trial court's denial of this claim is the last reasoned decision

for purposes of this Court's review as the Appellate Division denied this claim without

discussion.  *See Ylst*, 501 U.S. at 803.

The disclosure of petitioner's incarceration "may, in certain circumstances, violate a

defendant's due process right to a fair trial."  *United States v. Faulk*, 53 F. App'x 644, 647 (3d

Cir. 2002). For example, a panel of the Third Circuit in *Faulk*, using *Estelle v. Williams*, 425 U.S. 501, 512-13 (1976), noted that "a defendant's Fourteenth Amendment rights are violated if compelled to stand before a jury while dressed in identifiable prison clothes." *Faulk*, 53 F. App'x at 647 (citation omitted). In *Estelle*, "[t]he Supreme Court emphasized that 'the constant reminder' to the jury over the course of a trial that the defendant is a prisoner may impair the presumption of innocence." *Id.* (citing *Estelle*, 425 U.S. at 504). Nevertheless, many courts have noted that the "the mere utterance of the word [jail, prison, or arrest] does not, without regard to the context or circumstances, constitute reversible error per se." *United States v. Villanona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1995) (quoting *United States v. Veteto*, 701 F.2d 139-40 11th Cir. 1983) (quoting *United States v. Barcenas*, 498 F.2d 1110, 1113 (11th Cir. 1974))); *see also United States v. Atencio*, 435 F.3d 1222, 1237 (10th Cir. 2006) ("The rule of *Estelle* does not apply, to every mere utterance of the words [jail, prison, or arrest], without reference to context or circumstances.") (internal quotation marks and citation omitted); *Faulk*, 53 F. App'x at 648; *United States v. Alsop*, 12 F. App'x 253, 258 (6th Cir. 2001); *United States v. Henry*, Crim. No. 06-33-02, 2012 WL 5881848, at *6 (E.D. Pa. Nov. 21, 2012) (noting that courts from outside the Third Circuit have held, in line with *Faulk*, that mere utterance of words jail, prison or arrest does not amount to a constitutional violation). As some courts have explained, this distinction "is because 'the impact of referring to a defendant's incarceration is not constant as it is with prison garb.'" *United States v. Falciglia*, No. 09-120, 2010 WL 2408153, at *9 (W.D. Pa. June 7, 2010) (quoting *United States v. Washington*, 462 F.3d 1124, 1136-37 (9th Cir. 2006)). Thus, isolated or brief references to a defendant's incarceration during trial do not necessarily amount to a due process violation. *See Atencio*, 435 F.3d at 1238 (prosecutor's single reference that defendant was in jail did not impair presumption of innocence since it was

isolated and not a continuing occurrence); *United States v. Allen*, 425 F.3d 1231, 1236 (9th Cir. 2005); *Faulk*, 53 F. App'x at 647-48 ("[W]e find that the prosecutor's brief (albeit repeated) mention of Faulk's imprisonment in a single short series of questions did not serve as a 'constant reminder' to the jury of defendant's condition so as to impair the presumption of innocence."); *Falciglia*, 2010 WL 2408153, at *10 (witnesses two references to defendant being an "inmate" did not impair the presumption of innocence because it did not constitute a "constant reminder" that defendant had been incarcerated).

In this case, references to petitioner's incarceration were brief and in passing. They did not serve as a "constant reminder" to the jury that petitioner had been incarcerated and did not impair his presumption of innocence. *See Faulk*, 53 F. App'x at 647. Additionally, the trial court gave petitioner the opportunity to come up with a curative instruction.[4] Furthermore, the second reference by Ulbrich did not even necessarily implicate that petitioner was in jail, only that the buccal swabs were taken from petitioner at the Cape May County Jail. Under these circumstances, and when viewed in context, the Court finds that the state court's denial of this claim was not an unreasonable application of clearly established federal law and the decision was not based on an unreasonable determination of the facts. Accordingly, this claim does not warrant granting federal habeas relief.

F. Claim VI – Failure to Suppress Statement

In Claim VI, petitioner argues that the trial court erred in refusing to suppress his statement to the police. He claims that the State failed to prove that his statements were voluntarily given after waiving his *Miranda* rights. He states that he was interviewed by two detectives at once and was handcuffed and placed in a holding cell before the interrogation. The

---

[4] It does not appear that petitioner elected to create such an instruction for the trial court's consideration.

last reasoned decision on this claim was from the trial court which denied petitioner's motion to suppress his statement to police.  In denying the motion to suppress, the trial court stated as follows:

> Clearly, the burden is on the State.  Equally, clearly, the standard of proof is beyond a reasonable doubt.  This being a 104 hearing outside the presence of the Jury to determine whether or not the defendant's statements will be admissible at trial whether or not the requirements of Miranda were complied with.
>
> The testimony is that the defendant had an outstanding bench warrant.  Once the officers learned of the existence of the bench warrant, they sought him out and took him into custody and took him back to the station.  The testimony of Detective Scull is that at the time the defendant was interviewed in essentially the Municipal Courtroom was not even in handcuffs although he had been told what was going to be the subject of the discussion and obviously of the existence of the bench warrant on an unrelated municipal matter.
>
> At the time he was interviewed, the witness has testified he was seated essentially at the head of a table with an officer on either side.  All were seated when the conversation took place.  The Miranda card was displayed.  It was read to the defendant.  He was asked if he understood what his rights consisted of.  He responded, yes.  And he in fact signed the card which was also signed, dated and a time noted by the officers who interviewed him.
>
> The question then becomes since the only proofs that I have from which conclusions of fact can be drawn are from the State and the proofs are that the defendant in a non-coercive atmosphere had his rights explained to him, said he understood them and then signed the card.  Was whether or not there was anything whatsoever in the statements he made in the circumstances thereafter that somehow made this voluntary, knowing and intelligent waiver of his Miranda rights improper from the inception of the waiver or thereafter and there simply isn't.
>
> This was a relatively brief interview.  The fact that it was not taped, given that the interview occurred four years ago, in particular establishes nothing.  The officers did not anticipate that the defendant would make a full confession despite of his waiver of his Miranda rights as acknowledged on the car and by his verbal statements.  Clearly, the facts that support the voluntariness of a

waiver or the non-coercive atmosphere down to not having him cuffed, the brevity of the interview, the context of the interview, the fact that a defendant, although he had been in a holding cell, was alone.  There were no weapons being shown, et cetera. That it was a knowing and intelligent as established from the fact that the defendant didn't even ask questions about it is a person actually with a prior criminal history of which the officers were aware.  He said he understood what his rights were and that he would take to the officers and he signed an acknowledgement thereof on the Miranda card.

It is certainly unrebutted that the defendant made a knowing and intelligent waiver of his rights.  When discussing the cases, he did specify his whereabouts on a particular night.  It turned out thereafter to be very significant.  But as the officer stated, at that point in the investigation, they had spoken to several individuals including the defendant.  The investigation was evolving and it was not until some time later that they understood the significance of the statements the defendant had made in which he claimed that he had basically been on his, in his room and intoxicated the entire night of the Maria Perez incident.

The State has met its burden of proof.

(Dkt. No. 10-3 at p. 21-22.)

The United States Supreme Court decision in *Miranda v. Arizona*, 384 U.S. 436 (1966) "held that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly, and intelligently.'" *Fahy*, 516 F.3d at 194 (quoting *Miranda*, 384 U.S. at 444).  This inquiry has two dimensions as explained by the Supreme Court; specifically:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstance surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  "The ultimate question in the voluntariness

calculus is 'whether, under the totality of the circumstances, the challenged confession was

obtained in a manner compatible with the requirements of the Constitution.'"  *Fahy*, 516 F.3d at

194 (quoting *Miller v. Fenton*, 474 U.S. 104, 112 (1985)).

In this case, the state court analyzed the totality of the circumstances in determining

whether petitioner's waiver of his *Miranda* rights was violated in the context of denying the

motion to suppress after conducting an evidentiary hearing.  The state court's decision was not

an unreasonable application of clearly established federal law.  Furthermore, upon reviewing the

suppression hearing transcript, its decision holding that the *Miranda* waiver was knowing and

intelligent was not based on an unreasonable determination of the facts.  Accordingly, petitioner

is not entitled to federal habeas relief on this claim.

### G. Claim VII – Change of Venue

In Claim VII, petitioner argues that the trial court should have ordered a change of venue

or empaneled a foreign jury because of undue pretrial publicity that failed to ensure that he

received a fair trial by an unbiased jury.  While the habeas petition states that the trial court

should have granted his motion for a change of venue, it appears that no such motion was ever

made by petitioner.  Indeed, petitioner's direct appeal brief to the Appellate Division argued as

follows, "[w]hile defendant did not specifically request a change of venue or foreign jury, the

trial court had an independent duty to act swiftly and decisively to overcome the potential bias of

the jury from outside influences."  (Dkt. No. 9-3 at p. 55-56.)  Nevertheless, there was some

discussion of the pretrial publicity of the case in the lead up to the retrial.  Indeed, immediately

prior to jury selection, the following colloquy took place between the trial court, Mr. Michael J.

Catanese, Esq. (petitioner's trial counsel) and Mr. David J. Meyer (assistant county prosecutor):

MR. CATANESE:  Judge the only other issue, as we discussed in chambers, would be –

THE COURT:  Oh yes.

MR. CATANESE:  I have here a copy of – actually not the copy. It's actually the original article taken out of Sunday's – or Saturday's Atlantic City Press, dated August 7th, 2004.  There was an article in the Region Section regarding this matter.  The headline reads, "Retrial of Woodbine Man on Kidnapping and Robbery Charges Set to Begin."  If I can have it marked, Your Honor, and –

THE COURT:  Yes, please.

MR. CATANESE:  Is it D-1 for identification?  I'm going to show it to Mr. Meyer.  May I approach the bench, Your Honor?

THE COURT:  Yep.  Prior to the notorious trials from Timothy McVeigh to O.J. Simpson to – of course, I can never think of notorious trials when I need to.  Prior to those types of trials, articles such as this one seemed to have far greater significance than they do now.

I absolutely will ask each and every Juror if they have read anything about this case and I will ask them at sidebar if, as a result of reading that case, they have an opinion and, if so, can they set that opinion aside and honestly decide the case on its merits.  It may make Jury Selection extremely difficult, but there it is and we'll just deal with it as best we can and, hopefully, not run out of Jurors, which is the main thing I'm concerned about.  If too many people, as result of reading this article, have formulated opinions, it will be a problem.

But, like I said, folks have been asked in all kinds of contexts if they can be open minded, have indicated that they can.  Hopefully, we'll end up with 16 people who are qualified in every respect, including that one.  But believe me I will ask the Jurors about it because I share your concern that some folks may be tainted.

Are there any other Jurors available, Ms. Payne, for tomorrow?

THE JURY ATTENDANT:  I don't believe so, Your Honor.

THE COURT:  So – okay.

MR. CATANESE:  Judge, if I may just briefly follow up on Your Honor's comments.  This was obviously, I don't – well, it's getting rather old.  I don't believe it has been the subject of extensive pretrial publicity.  There has been some.

THE COURT:  This is –

MR. CATANESE:  The problem –

THE COURT:  This is pretty serious.

MR. CATANESE:  Well, the problem with this article, Judge – and I don't know if you could – anyway, if there's any Jurors that would, you know – I suppose we can't really deal with it until we see what happens, but the concern that I would have, Your Honor,

is that – that the defense would have would be that any potential
Juror who read that specific article is going to be aware of the fact
that Mr. Price was convicted by a prior Jury.  And it would seem to
me that any person who would know that someone's been through
a full-fledged trial and convicted – it even references the fact that it
was a problem with Jury Selection, as opposed to, like, some sort
of error in the trial itself, that that – even though a person may
indicate, "I could keep an open mind," I don't know how a human
being could not take that and give that weight in their deliberation.
In other words, that individual – any – I would submit, Your
Honor, just as a carte blanche, any individual who read that article
as a potential Juror should be dismissed for cause, Your Honor.
THE COURT:  Well, I will absolutely –
MR. CATANESE:  Well, yeah, we'll deal with that when it –
THE COURT:  We'll deal with it –
MR. CATANESE:  There may not be anybody.  Maybe we'll have
a Jury Panel – a bunch of people who went out and went fishing or
went to the beach on Saturday and never read the Press, but –
THE COURT:  Thank goodness it was good weather.
MR. CATANES:  And we'll see what happens.  Exactly.
THE COURT:  Yeah, All right.

(Dkt. No. 105- at p. 9-10.)

The Appellate Division summarily denied petitioner's claim on direct appeal that the trial

court should have *sua sponte* transferred venue of this case.  However, petitioner's burden "still

must be met by showing there was no reasonable basis for the state court to deny relief."

*Harrington*, 562 U.S. at 98.  "[A] habeas court must determine what arguments or theories . . .

could have supporte[d] the state court's decision; and then must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of this Court."  *Cullen*, 131 S. Ct. at 1402 (internal quotation marks

and citation omitted).

The Fourteenth Amendment guarantees a criminal defendant a right to a trial by an

impartial jury free from outside influences.  *See Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).

In some cases, a court may presume prejudice to the defendant such as "[w]here media or other

community reaction to a crime or a defendant endangers an atmosphere so hostile and pervasive as to preclude a rational trial process[.]" *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992) (citing *Sheppard*, 384 U.S. 333; *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963)), *overruled on other grounds by*, *Brecht*, 507 U.S. 619; *see also Campbell v. Bradshaw*, 674 F.3d 578, 593 (6th Cir. 2012) ("'Presumptive prejudice from pretrial publicity occurs where inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community[.]'") (quoting *Foley v. Parker*, 488 F.3d 377, 287 (6th Cir. 2007)). "[T]he community and media reaction, however, must have been so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." *Rock*, 959 F.2d at 1252-53 (citations omitted).  Nevertheless, the United States Supreme Court has explained that the presumption of prejudice from pretrial publicity "attends only in the extreme case." *United States v. Skilling*, 561 U.S. 358, 381 (2010); *see also Campbell*, 674 F.3d at 593 (noting that presumptive prejudice from pretrial publicity is rarely presumed); *Rock*, 959 F.2d at 1252 (cases of presumed prejudice from pretrial publicity "are exceedingly rare.").

In *Skilling*, 561 U.S. at 379-81, the Supreme Court traced the history of its cases with respect to presumed prejudice due to pretrial publicity by citing to its opinions in *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966):

> Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them.  Police interrogated Rideau in jail without counsel present and obtained his confession.  Without informing Rideau, no less seeking his consent, the police filmed the interrogation.  On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals.  Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people.  The trial court

denied the motion, and a jury eventually convicted Rideau.  The Supreme Court of Louisiana upheld the conviction.

We reversed.  "What the people [in the community] saw on their television sets," we observed, "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder." *Id.,* at 725, 83 S. Ct. 1417.  "[T]o the tens of thousands of people who saw and heard it," we explained, the interrogation "in a very real sense *was* Rideau's trial—at which he pleaded guilty."  *Id.,* at 726, 83 S. Ct. 1417.  We therefore "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire,*" that "[t]he kangaroo court proceedings" trailing the televised confession violated due process.  *Id.,* at 726–727, 83 S. Ct. 1417.

We followed *Rideau* 's lead in two later cases in which media coverage manifestly tainted a criminal prosecution.  In *Estes v. Texas,* 381 U.S. 532, 538, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and "bombard[ed] ... the community with the sights and sounds of" the pretrial hearing.   The media's overzealous reporting efforts, we observed, "led to considerable disruption" and denied the "judicial serenity and calm to which [Billie Sol Estes] was entitled." *Id.,* at 536, 85 S. Ct. 1628.

Similarly, in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death.  "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." *Id.,* at 353, 355, 86 S. Ct. 1507.  Pretrial media coverage, which we characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process, we noted.  *Id.,* at 354, 86 S. Ct. 1507.  But Sheppard's case involved more than heated reporting pretrial:  We upset the murder conviction because a "carnival atmosphere" pervaded the trial, *id.,* at 358, 86 S. Ct. 1507.

In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process." *Murphy v. Florida,* 421 U.S. 794, 798–799, 95 S. Ct. 2031, 44 L.

Ed. 2d 589 (1975).  See also, *e.g., Patton v. Yount,* 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).  Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance.  Irvin v. Dowd,* 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States,* 98 U.S. 145, 155–156, 25 L. Ed. 244 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.").  A presumption of prejudice, our decisions indicate, attends only the extreme case.

*Skilling,* 561 U.S. at 379-81 (footnote omitted).  With these cases as a backdrop, in *Skilling* the Supreme Court found a number of considerations to be relevant in determining whether there is presumed prejudice, such as:  (1) the size and characteristics of the community in which the crime occurred; (2) the content of the media coverage; (3) the timing of the media coverage; and (4) the existence of media interference with court proceedings.  *See* 561 U.S. at 382-84.

Petitioner never presented before the state courts evidence with respect to the size and characteristics of the community in Cape May County[5], nor does he present such evidence before this Court.  Furthermore, even if petitioner had presented such evidence with respect to the size and characteristics of Cape May County in his habeas petition, it is improper for this Court to receive such evidence when analyzing this Claim under the AEDPA standard of review. *See Cullen*, 131 S. Ct. at 1398, 1400 (noting that federal habeas review under § 2254 "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that

---

[5] Petitioner's direct appellate brief to the Appellate Division referenced the "small community" of Woodbine and Cape May County itself.  (*See* Dkt. No. 9-3 at p. 62.)  However, petitioner provided the state court with no figures or evidence to support this statement.

evidence introduced in federal court has no bearing on" such review).  As such, this Court cannot say that this factor weighed for or against a finding of presumed prejudice.[6]

The second factor requires a court to examine the content of the news coverage.  As previously noted, petitioner's conviction arose from a second trial after the first trial was reversed and remanded due to the statements of a discharged juror.  Before the trial court, petitioner's counsel expressed concern about an Atlantic City Press article that was issued a few days prior to the re-trial that discussed the prior trial and conviction.  Petitioner's appellate brief on direct appeal also referenced another article that purportedly showed petitioner being led into the courtroom in handcuffs and referenced the prior trial and conviction.

Accordingly, the purported pretrial publicity as petitioner asserted in the state courts with respect to petitioner's re-trial amounted to two newspaper articles.  Petitioner's trial counsel even admitted that the pretrial publicity for this case was not "extensive."  While the first article was purportedly from the Atlantic City Press, it is unclear where the purported second article came from.  For the most part, petitioner did not show the state courts that these articles were anything more than factual in nature that petitioner was being retried on kidnapping charges.  As best this Court can determine since the two articles are not included in the record, the two articles mentioned by petitioner to the state courts may be far different than the type and content of pre-trial publicity that arose with the defendant's confession in *Rideau* or the type of "bedlam" coverage in *Sheppard*.  Indeed, in *Skilling*, 561 U.S. at 383, the Supreme Court cited to *United States v. Chagra*, 669 F.2d 241, 251-52 n. 11 (5th Cir. 1982), which noted that, "[a] jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no

---

[6] Even if this Court were to find that this factor weighed in favor of changing venue, the state court's denial of this Claim was not an unreasonable application of clearly established federal law based on the remaining factors as discussed *infra*.

difficulty in rejecting the opinions of others because they may not be well founded."  As one

court has noted, "the highly factual nature of the media coverage, coupled with the fact that the

news stories contain no confessions by Defendants, weigh against a finding of presumed

prejudice."  *United States v. Savage*, Crim. Nos. 07-550-03, 07-550-04, 07-550-05, 07-550-06,

2012 WL 2376680, at *5 (E.D. Pa. June 25, 2012) (citing *United States v. Lindh*, 212 F. Supp. 2d

541, 549 (E.D. Va. 2002)).  In this case, petitioner's statements to the state courts regarding the

pretrial publicity in the form of two newspaper articles immediately prior to his second trial did

not weigh in favor of transferring trial of this case to another venue.

The third factor to consider is the timing of the media coverage.  The incidents giving rise

to the charges in this case took place in 2000.  Petitioner vaguely alluded to widespread

dissemination of publicity of petitioner's first trial in his appellate brief to the Appellate Division

on direct appeal.  However, he only mentioned two articles that were issued immediately prior to

his re-trial in 2004.  In the absence of evidence that showed a high level of media interest

continuing up to petitioner's re-trial, this factor also does not weigh in favor of a transfer.  *See*

*Hertzel v. Lamas*, 372 F. App'x 280, 284 (3d Cir. 2010) ("The passage of time and the sporadic

nature of the coverage in the months proceeding the trial suggest that any prejudice that may

have been presumed around the time of Guzman's death and Hetzel's arrest may have dissipated

by the next year); *see also United States v. Matusiewicz*, Crim. Nos. 12-83-1, 12-83-2, 13-83-3,

2014 WL 2446084, at *4 (D. Del. May 29, 2014) ("In the absence of evidence that a high level

of media interest had continued since the shootings, the court concludes that a period of more

than a year is a sufficient cooling off period.") (citation omitted).

The fourth factor to consider is the extent to which there has been media interference

Maybe I'll come downMMwith the actual courtroom proceedings. *See Skilling*, 561 U.S. at 382

39

n.14; *see also Savage*, 2012 WL 2376680, at *4 (citing *United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 793 (W.D. Pa. 2010)).  In this case, there was nothing before the state courts to suggest media interference with the courtroom proceedings.  Therefore, this factor also did not weigh in favor of a transfer.

Applying the factors outlined above, petitioner did not show that the state court's denial of his claim of presumed prejudice necessitating a transfer was an unreasonable application of clearly established federal law or the result of a decision based on an unreasonable determination of the facts.  This conclusion, however, does not end the analysis on this claim as this Court must next analyze whether actual prejudice infected petitioner's jury.  *See Skilling*, 561 U.S. at 385; *see also Savage*, 2012 WL 2376680 at *3 (noting distinction between presumed prejudice and actual prejudice with respect to changing venue based on pretrial publicity).

Where there is an absence of facts demonstrating presumed prejudice, a petitioner must show actual prejudice such that those who served on the jury could not reach an impartial verdict based solely on the evidence produced at trial.  *See Patton v. Yount*, 467 U.S. 1025, 1035 (1984), *citing Irvin*, 366 U.S. at 723); *see also Rock*, 959 F.2d 1237 ("In the absence of a showing of an 'utterly corrupt' trial atmosphere, the defendant, in order to demonstrate a violation of his right to an impartial jury, must establish that those who actually served on his jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom.") (citations omitted).  As the Supreme Court has noted:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence

> of an accused, without more, is sufficient to rebut the presumption
> of a prospective juror's impartiality would be to establish an
> impossible standard.  It is sufficient if the juror can lay aside his
> impression or opinion and render a verdict based on the evidence
> presented in court.

*Irvin*, 366 U.S. at 722-23 (citations omitted); *see also Rock*, 959 F.2d at 1253 ("The fact that jury members may have been exposed to press reports or other community reaction concerning the case and even the fact that they may have formed a tentative opinion based on that exposure will not establish a constitutional violation if the trial court has found, with record support, that each of the jurors was able to put aside extrinsic influences.").

A review of the voir dire indicates that the state court's denial of this claim did not run afoul of § 2244(d)(1) or (2).  One potential juror indicated at sidebar that he had read in the paper that this case was a retrial.  (*See* Dkt. No. 10-5 at p. 15.)  That juror was promptly excused.  (*See id.* at p. 16.)  Another juror indicated at sidebar that she had prior knowledge of what occurred.  (*See id.* at p. 18.)  It is unclear whether this prior knowledge was from the pretrial publicity or from another source.  However, this juror too was also promptly excused.  (*See id.*)  Subsequently, the trial judge made sure during voir dire that the remaining jurors did not have prior knowledge of this case on at least two occasions.  First, the trial judge asked the potential jurors as follows, "[B]ut any of you, presently seated in the box, familiar with this case because of anything they've heard outside the courtroom?  Anything at all outside the courtroom?  Anybody know anything about this case because of anything they've heard outside the courtroom?"  (Dkt. No. 10-5 at p. 45.)  No prospective juror in the box responded in the affirmative according to the transcript.  Subsequently, the trial judge was even more specific later on when he questioned the prospective jurors as follows:

> Do any of you have any prejudice against the defendant merely
> because he is a defendant in this case or for any other reason,
> including anything you might know about the case from outside

> the courtroom, media accounts, if any, discussions with friends – is
> there any reason whatsoever why anyone presently seated in the
> box could not serve as an open-minded and impartial Juror in this
> case?

(Dkt. No. 10-5 at p. 58.)  No one responded in the affirmative to the trial judge's inquiry.

Accordingly, a review of the voir dire transcript reveals that petitioner failed to show actual

prejudice based on the pretrial publicity of his case.  *See Stevens v. Beard*, 701 F. Supp. 2d 671,

726-27 (W.D. Pa. 2010) (reviewing voir dire transcript and finding no actual prejudice where

only three prospective jurors were dismissed for cause because they had a fixed opinion about

the case based on the media coverage).  Therefore, the denial of this claim by the state courts was

not an unreasonable application of clearly established federal law nor was the decision based on

an unreasonable determination of the facts as petitioner failed to show presumed prejudice and/or

actual prejudice to the state courts based on pretrial publicity.  Accordingly, petitioner is not

entitled to federal habeas relief on this claim.

H.  Claim VIII – Failure to Recuse

   In Claim VIII, petitioner argues that the trial court erred in denying his motion to recuse.

The Appellate Division denied this claim without discussion.  Therefore, the last reasoned

decision on this claim for purposes of AEDPA review is from the trial court.

   At petitioner's retrial, the trial court issued a mistrial during the course of the voir dire of

the first jury to be empaneled due to statements that one prospective juror made.  More

specifically, one prospective juror in that first jury pool on retrial stated that, "I got mugged by a

nigger a couple of years ago, and if I get a chance to put a nigger away, I will."  (Dkt. No. 10-4 at

p. 32.)  Subsequently, petitioner moved for a mistrial which was granted such that a new separate

second jury was empaneled a week later.  The trial judge stated the following in granting the

motion for a mistrial due to this prospective juror's statements from the first jury that was

empaneled:

> Folks, an application for a mistrial has been made in this matter because of the unforeseeable misconduct of a potential juror that at some point certainly warrants contempt proceedings against that individual for his conduct.
>
> I guess this defect is curable by an instruction.  Most – not most, but all reasonable persons can agree that the conduct was so outrageous in nature that it would not influence an individual to be prejudiced against the defendant or persons of color as much as to cause a reaction in the contrary direction, to bend over backwards to the detriment of the State, frankly.
>
> The standard for the grant of a mistrial is the same as that for a new trial motion, whether or not the error is such that manifest injustice would result from the continuance.  Frankly, it is my intellectually, honest opinion that it would not, that the error can be corrected.
>
> But the reversal in this case in my opinion was not grounded in reason initially.  The situation in that case was if error readily correctable and not ultimately not error at all.
>
> To try cases because of the fear that the Appellate Division will disagree with the body of law that exists or the decisions that exist are made at the trial level to me is to bring the practice of law to a pretty low point.
>
> But I guess, given the reversal in this case, which is one I will certainly be mindful of the rest of my judicial career, I will declare a mistrial in this instance.  I do not think it's an error that cannot be corrected, but I cannot with confidence believe that the corrective measure that would be taken would satisfy others.
>
> The proofs in this case are quite significant.  They're – there's every reason to believe that there will be a second conviction and a review.  I mean, we'll try again next Monday.

(Dkt. No. 10-4 at p. 44-45.)  After the second jury was empaneled the following week, petitioner

argued that the trial judge should recuse herself based on the statements she had made in granting

the mistrial the previous week.  Indeed, petitioner's counsel argued as follows:

MS. PFEIFLE:  . . . . Your Honor, first, as we discussed previously, at this point, on behalf of Mr. Price, I'm making a motion for recusal.  Your Honor, I'm basing that request of asking that you recuse yourself from hearing this case based primarily on your comments made last Monday, while you were ruling on the mistrial.  You indicated specifically that there had been convictions in the previous case, you anticipated convictions in this case and you commented, I felt with some specificity, on the weight and credibility of the evidence presented.

Mr. Price does have a right for these proceedings to be unbiased and I believe your remarks call into question your ability to be open minded in this proceeding.  Therefore, we're moving that you recuse yourself.

(Dkt. No. 10-5 at p. 4.)  In denying petitioner's motion for recusal, the trial judge stated as

follows:

Not only do judges who are reversed routinely retry cases, judges in most counties are assigned matters for purpose of pretrial motions, bail hearings and, ultimately, trial, as a result of which you acquire an intimate knowledge of the proofs the State has. The proofs in this case involved two victims testifying, one of whom said she specifically recognized the defendant's voice.  It's not surprising that I would have characterized the proofs in the manner that I did and I do anticipate the same outcome.  That's what happens when proofs are strong.

Does that constitute a basis for recusal?  If I were the factfinder, absolutely.  In Family Court, for example, it often happens that judges request some other judge to resolve a dispute because he or she is the factfinder and he or she has opinions.  It's a little different in a criminal matter.  I'm basically the ump.

I have the good fortune that this case will be tried by experienced, competent and capable attorneys.  I have the good fortune that we again have a large Jury panel.  We are going to seat 16 in the box and the decisions as to whether the State has met its burdens of proof will rest entirely on them.  Whatever my personal opinion may be as to this matter is irrelevant, will not be disclosed to the Jury, obviously, and I know that the attorneys will do their part, as officers of the Court, to ensure that the process is fair.  Therefore, the application is denied.

(Dkt. No. 31-1 at p. 1.)  In state court, petitioner argued that the trial judge was required to recuse herself based on New Jersey Court Rule 1:12-1 which requires recusal if the judge gives an opinion upon a matter in question in the action, is interested in the action or where there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so.  However, as described previously, it is not the province of this Court to examine state court determinations of state law.  *See Estelle*, 502 U.S. at 67-68.

Nevertheless, "[a] fair trial in a fair tribunal is a basis requirement of due process."  *In re Murchison*, 349 U.S. 133, 136 (1955).  However, "'most matters relating to judicial disqualification d[o] not rise to a constitutional level.'"  *Martinez v. Stridiron*, 538 F. App'x 184, 188 (3d Cir. 2013) (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702 (1948)).  "Due process requires recusal only when a judge 'has a direct, personal, substantial, pecuniary interest in a case' or when there are 'circumstances in which experience teaches that the [objective] probability of actual bias on the part of the judge or decisionmarker is too high to be constitutionally tolerable.'"  *Id.* (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876-77 (2009)).

In this case, the denial of this claim by the state courts was not an unreasonable application of clearly established federal law nor was the decision based on an unreasonable determination of the facts.  In *Liteky v. United States*, 510 U.S. 540 (1994), the Supreme Court noted that, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment unfair."  *Id.* at 555 (emphasis added).  Indeed, the Supreme Court further noted in

*Liteky* that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Id.*  Furthermore, and perhaps most relevant to this case, the Supreme Court explained that, "[a]lso not subject to deprecatory characterization are 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings.  It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant."  *Id.* at 551.  In *Liteky*, the Supreme Court gave an example of what kind of statement by a judge would require his recusal.  The Court's example was a District Judge's statement in a World War I espionage case against German-American defendants that, "'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their "hearts are reeking with disloyalty.'"  *Id.* (citing *Berger v. United States*, 255 U.S. 22, 28 (1921)).

In this case, the trial judge's statement in granting the motion for mistrial was based on facts introduced in the prior trial.  They did not display a deep-seated favoritism or antagonism that would make fair judgment impossible or unfair.  Indeed, the trial judge noted that she would not make such an opinion known to the newly empaneled jury, and noted that it was the jury, and not her who was the ultimate factfinder.  Accordingly, based on these circumstances, petitioner has failed to show that he is entitled to federal habeas relief on this claim.

I.   <u>Claim IX – Ineffective Assistance of Counsel for Failure to Seek Suppression of Cigarette Butt</u>

In Claim IX, petitioner argues that trial counsel was ineffective for failing to seek suppression of the cigarette butt that contained his DNA evidence.  He asserts as follows in his habeas petition:

> The cigarette butt was allegedly located some 16 hours after the crime scene investigator.  There is no evidence that this evidence was ever lodged into evidence prior to police searching the defendant's home and admitting to coming into contact with cigarette butts that were known to belong to the defendant.  The cigarette butt that was reportedly located at the crime scene was found to have the defendant's DNA on it.  Counsel was ineffective for failing to challenge the chain of custody regarding this crucial and prejudicial piece of evidence.

(Dkt. No. 1 at p. 8.)  Thus, petitioner's claim on habeas review appears to be that the cigarette butt was not found at the crime scene, but instead was a cigarette butt that the police found when they subsequently searched petitioner's dwelling.

In *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court articulated the test for demonstrating an ineffective assistance of counsel claim.  First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.* at 688; *see also Ross v. Varano,* 712 F.3d 784, 798 (3d Cir.2013).  Petitioner must identify acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *See Strickland,* 466 U.S. at 690.  The federal court must then determine whether in light of all of the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  *See id.*

Second, a petitioner must affirmatively show prejudice, which is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale,*

687 F.3d 92, 102 n. 11 (3d Cir.2012).  "With respect to the sequence of the two prongs, the

*Strickland* Court held that 'a court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed.'"  *Rainey*

*v. Varner,* 603 F.3d 189, 201 (3d Cir.2010) (quoting *Strickland,* 466 U.S. at 697).

Additionally, in assessing an ineffective assistance of counsel claim under AEDPA, the

Supreme Court has noted that:

> The pivotal question is whether the state court's application of the
> *Strickland* standard was unreasonable.  This is different from
> asking whether defense counsel's performance fell below
> *Strickland*'s standard.  Were that the inquiry, the analysis would be
> no different than if, for example, this Court were adjudicating a
> *Strickland* claim on direct review of a criminal conviction in a
> United States district court.  Under AEDPA, though, it is a
> necessary premise that the two questions are different.  For
> purposes of § 2254(d)(1), an *unreasonable* application of federal
> law is different from an *incorrect* application of federal law.  A
> state court must be granted a deference and latitude that are not in
> operation when the case involves review under the *Strickland*
> standard itself.

*Harrington,* 562 U.S. at 101 (internal quotation marks and citation omitted) (emphasis in

original).

Petitioner raised this claim in his post-conviction relief ("PCR") petition.  The last

reasoned decision on this Claim was from the Appellate Division during petitioner's PCR

proceedings.  The Appellate Division analyzed this Claim as follows:

> A prima facie claim of ineffective assistance of counsel requires
> defendant to show (1) counsel's performance was deficient; and (2)
> but for counsel's deficient performance, the outcome of the trial
> would have been different.  *Strickland v. Washington,* 466 U.S.
> 668, 687-88, 104 S. Ct. 2052, 2064-65, 80 L. Ed. 2d 674, 693
> (1984); *State v. Fritz,* 105 N.J. 42, 52, 519 A.2d 336 (1987).

Adequate assistance of counsel should be measured by a standard of "reasonable competence." *Fritz, supra,* 105 N.J. at 60, 519 A.2d 336. That standard does not require "the best of attorneys," but rather requires that attorneys be not "so ineffective as to make the idea of a fair trial meaningless." *State v. Davis,* 116 N .J. 341, 351, 561 A.2d 1082 (1989), *superseded by statute on other grounds as recognized by State v. Cruz,* 163 N.J. 403, 411, 749 A.2d 832 (2000). "[T]he defendant must overcome a 'strong presumption' that counsel exercised 'reasonable professional' judgment and 'sound trial strategy' in fulfilling his responsibilities." *State v. Loftin,* 191 N.J. 172, 198, 922 A.2d 1210 (2007).

Defendant argues he made a prima facie showing that police fabricated evidence, specifically that detectives switched a cigarette butt found on the roof of the second crime scene with one from his ashtray. We find this argument to be without merit and rely substantially on the reasons stated by Judge Batten on the record on January 14, 2009.

> [p]etitioner now asserts that trial counsel was ineffective in not moving for suppression to the cigarette butt on a chain of custody theory or in the alternative, failing to discredit that evidence through cross-examination or by jury argument because competent counsel would have done either or both of these things.

> These arguments, while interesting and while the subject of extensive dialogue between counsel and the Court when last we convened on this-is nonetheless denied and for the following reasons.

> The cigarette butt found by [the victim] was taken into evidence by Detective [Scull] before the defendant's room was searched.... The defense argument, therefore, that the police switched or planted the cigarette butt with one they obtained from his room is not borne by the evidence and certainly not supported. There is no evidence that [the victim] or the two individuals at the home with [the victim] at the time Detective [Scull] arrived had access to the defendant's room prior to the cigarette butt being found. As a result, this argument lacks sufficient merit.

> As to petitioner's assertion that trial counsel failed to discredit the argument on cross-examination, or when making arguments to the jury, the assertion also lacks merit as specific portions of the trial transcript demonstrate.
>
> We note that the court critically addressed defendant's argument concerning police fabrication of evidence in exhaustive detail.  The court fully reviewed the record in search of credible evidence to support defendant's claims and determined the claims lack sufficient merit.  Our review of the record supports the court's findings that defendant's characterization of the events regarding the discovery of the cigarette butt is factually inaccurate and unsupported by the record.  Furthermore, the court pointed to numerous instances in the record, contrary to defendant's argument, where his counsel attempted unsuccessfully to discredit the cigarette butt's chain of custody.

(Dkt. No. 9-22 at p. 2-3.)

The denial of this claim by the state courts was not an unreasonable application of clearly established federal law.  The Appellate Division cited to and applied the *Strickland* test to determine whether the PCR court properly denied this Claim.  It specifically relied on the reasons given by the PCR court.  That Court also stated the correct *Strickland* standard.  It then painstakingly cited to the trial transcript with respect to the cross-examination of Detective Skull.  This was the Detective who was called to Perez's dwelling where the cigarette butt was discovered.  Skull testified that it was these witnesses who discovered and subsequently turned over the cigarette butt to him.  As the PCR court noted, there was nothing to suggest that these witnesses had access to petitioner's cigarette butts in his dwelling prior to turning the cigarette but over to Skull.  Accordingly, as there was a lack of evidence suggesting that the witnesses had access to petitioner's cigarette butts from another location, the denial of this claim was not based on an unreasonable application of *Strickland* since there was no reasonable probability that the outcome of the trial would have been different had such an argument been made by trial counsel.

Furthermore, petitioner fails to show that the denial of this claim was based on an unreasonable

determination of the facts as the record does not suggest that these witnesses had access to

petitioner's cigarette butts, other than that which was found on Perez's roof.  Therefore,

petitioner is not entitled to federal habeas relief on this claim.

   J.   <u>Claim X – Ineffective Assistance of Counsel for Failure to Move to Suppress Voice
        Identification</u>

        In Claim X, petitioner argues that trial counsel was ineffective for failing to suppress the

voice identification of petitioner by Mary Perez.  More specifically, petitioner argues as follows:

> The detective conducting the voice identification of the defendant
> did so by engaging him in conversation with the victim standing
> outside of the holding cell door where the defendant was being
> detained reportedly on an unrelated arrest warrant.  The detective
> accused the defendant of lying about his alibi, and asserted that a
> witness stated that he was out of his home at the time that the
> crime was committed against Mary Perez.  The defendant
> reportedly responded by screaming that he did go out but that he
> was home well before midnight, well before the crime was
> allegedly committed.  This procedure was extremely prejudicial.
> The victim asserted that the voice "sounded" like that of her
> assailant but that she could not be sure.  It should be noted that this
> same victim gave a taped statement earlier this same day and was
> asked if she could learn anything from the suspects voice, she did
> not mention the defendant despite knowing him.  By the time trial
> came around, the victim was convinced that she had previously
> named the defendant as the perpetrator of the crime against her.
> Clearly this is the result of the impermissibly suggestive voice
> identification procedure.

(Dkt. No. 1 at p. 8-9.)

        It appears that the Appellate Division denied this specific claim without discussion.

Therefore, the last reasoned decision on this Claim for purposes of this Court's AEDPA review

is from the PCR court which denied petitioner's PCR petition.  That Court stated as follows in

denying this Claim:

The Court now considers the second point raised by PCR counsel, specifically, that defense counsel was ineffective for failing to move to suppress the voice identification authored by Mary Perez. Again, Mr. Patrick in the first trial represented – represented the defendant in the first trial and specifically moved to bar any testimony concerning the voice identification of Ms. Perez.  The motion was dated September 8 of '01.

The State responded that it was not seeking to introduce the voice identification of the defendant at the police barracks – only identification that Ms. Perez at the scene . . . .

The three different police reports all pertaining to statements of Mr. Perez prior to the identification or confirmation of her assailant which took place at the police barracks, Ms. Perez states that the voice of her assailant was that of Lonny Price – specifically, Anthony [sic] Price.

For example, at page 18 of Exhibit M of the defendant exhibit Detective Albrich explained quote, "She explained her familiarity with Lonny Price's voice by telling Albrich that she works in the pharmacy that is located beneath her apartment.  She knows Lonny Price and has spoken with him on the telephone on numerous occasions while working at the pharmacy."

"She stated that over time she's become familiar with the sound of people's voices to the extent that she often knows who the caller is without their identifying themselves.  She said this is the type of situation as with Lonny Price.  She said that he has called the pharmacy on a number of occasions and that she has also become familiar with his voice as well to the extent that she can recognize a telephone call from him without him identifying himself."  close quote.

The State is correct in its assertion that trial counsel on behalf of the petitioner did, in fact, file a motion to suppress the voice identification.  That motion was dated July 8th of 2004, filed with the Court July 9, of 2004 and, in fact, motion trial counsel made almost verbatim – in places, in fact, it is verbatim for paragraphs at a time – the same argument that PCR counsel is making as to why the voice identification should be suppressed.  Same facts and cases are used in the motion to suppress and the PCR brief.

The State responded to this motion to suppress by advising the Court that the State would not present evidence in its case in chief regarding the voice identification that occurred at the police

barracks and that it would only present evidence as to the identification of the defendant at the scene of the crime.  The same exchange took place before the first trial of the defendant when Mr. Patrick represented the petitioner.

Again, the record before this Court is less than clear as to the trial court's ultimate disposition of that motion although it is not relevant for purposes of this PCR application because of the appellate reversal.  Not having the entire trial transcript of the second trial of the defendant, among the petitioner's excerpts are excerpts of the trial transcript and from pieces of the transcript that have been presented, it appears that the voice identification at the police barracks was not used at trial.

The following excerpt, part of trial counsel's closing argument illustrate this apparency.

Quote, "Those of you who hold uncertainties must find Alonzo Pri" – "must ultimately find Alonzo Price not guilty.  Look at the State's proofs in light of its burden.  The one piece of direct evidence that was presented was Mary Helen Perez's voice identification.  She thought the voice sounded like the voice of Alonzo Price," close quote.

"Mary Helen Perez was not certain.  She told us that.  Mary Helen Perez," – excuse me – "Mary Helen Perez was not certain.  She told us that.  Mary Helen Perez didn't want to rule anyone out.  She told us that.  She wasn't sure about the voice.  She was so uncertain, she didn't tell the 911 operator she was so unsure.  She didn't scream it out the window at the fleeing assailant.  Said – testified that she knows Alonzo Price.  She knows him from around town.  She's had contact with him.  He's been in the pharmacy where she's worked 25 years as a customer."

"Camden County is small.  Woodbine is smaller still.  She knew Alonzo Price.  She knew him.  She could identify him.  She knew him from their contacts from a coming to a place open to the public.  And for all that, she wasn't certain from the voice.  She told Detective Albrich she wasn't certain.  Detective Albrich took a statement – formal taped statement meant to be a record of everything relevant, everything important that she remembered while still fresh in her mind.  That's why it was tape recorded to create a record."

"In that statement, she described the attack.  She described the voice she heard, the tone, the volume.  She didn't say anything

about Alonzo Price in that statement because she wasn't certain.  It is admittedly a statement of uncertainty of Mary Helen Price (sic).  She didn't report the voice to the 911 operator because she wasn't sure.  She left it out of the taped statement because she wasn't certain.  Is that enough? . . . .

Later in the closing, trial counsel stated – argued, quote "What else happened with the voice?  The detectives on the scene, Detective Albrich says it's reported to him.  This was initially reported to troopers.  It's not called in.  It wasn't given a lot of weight.  It wasn't given a lot of credibility.  I guess that mistake thing was still coming into play."

"But no detective says, none of the eight troopers say, 'Let's call it in.  Let's find out what his address is.  Let's see if we can go check on this because she gave us a name.'"
"No one gets that information and walks the block and a half or two blocks over to 514 Madison, the defendant's address and knocked door.". . . .

As a result, trial counsel did file a formal motion to suppress the voice identification which occurred at the police barracks and that the State apparently did not use that identification and instead presented evidence and relied only on the initial voice identification at the scene of the crime on the morning of the incident.

As a result, petitioner's argument that the voice I.D. was inadmissible under *Johnson – Madison* (phonetic) fails.  The petitioner's claim that counsel was ineffective for failing to suppress the voice identification also must fail and therefore must be denied.

(Dkt. No. 10-16 at p. 24-27) (internal citations omitted).

As noted by the Superior Court, petitioner did in fact file a motion to suppress the voice

identification at the police barracks.  Thus, counsel was not ineffective since a motion to

suppress was actually made.  Furthermore, it appears as if there was an agreement not to refer to

the voice identification by Perez at the police barracks.  Petitioner does not note that the voice

identification at the police station was used at trial.  Accordingly, the state court's denial of this

claim was not an unreasonable application of *Strickland* nor was the denial of this claim based on

an unreasonable determination of the facts.  Therefore, petitioner is not entitled to federal habeas relief on this Claim.

K. <u>Claim XI – Ineffective Assistance of Counsel for Failing to Request Suppression of Evidence Following Illegal Arrest Because Arrest Warrant was Invalid</u>

In Claim XI, petitioner claims that his trial counsel was ineffective for failing to seek to suppress the evidence that was obtained after he was arrested since the arrest warrant was invalid.  More specifically, he argues:

> The state conceded that this arrest warrant was indeed invalid.  The state then asserted that they did not obtain any evidence from the defendant as a result of this illegal arrest.  Instead of the trial judge conducting an evidentiary hearing to ascertain for himself what was obtained as a result of this illegal arrest of the defendant, he went along with the state's claim that nothing was obtained as a result of the illegal arrest, and subsequently denied the defendant the ability to make a clear and concise record regarding the facts surrounding his illegal arrest and all that was obtained as a result of it.

(Dkt. No. 1 at p. 9.)  The Appellate Division denied this claim during the PCR proceedings by stating as follows:

> Defendant also argues counsel was ineffective for failing to contest the legality of his arrest and failing to move to exclude the "fruits" of the victim's voice identification.  However, as the PCR court correctly found, defendant's claim that trial counsel was ineffective for not moving to suppress fruits of the arrest warrant is meritless.  Although the State in its PCR argument conceded the arrest warrant was invalid, this fact did not have the potential to affect the outcome of the trial, because defendant was already a suspect.

(Dkt. No. 9-22 at p. 5.)  Indeed, the Superior Court laid out the factual and legal underpinnings giving rise to the Appellate Division's affirmance for denying this Claim by stating the following:

PCR counsel is somewhat that brief on this point, but it appears that PCR counsel is attempting to argue that trial counsel should have filed a motion to suppress the jean shorts, gray shirt and carpet finders (sic) – carpet fibers – excuse me – found in the shorts as fruit of the poisonous tree.  It should be initially noted that the State concedes that the arrest warrant in this matter – that issued June 29 of 2000 – was invalid.

Even had a motion to suppress the incriminating evidence obtained from petitioner's home been filed on the theory that the evidence obtained was fruit of an illegal arrest, the motion would more likely than not, in this Court's view, have been denied as a result the failure to make the motion does not warrant a finding of ineffective assistance of counsel for the following reasons.

The police obtained a voice identification from Mr. [sic] Perez shortly after the crime on June 29 occurred  . . . sometime after 2:42 a.m.

As such, the petitioner was already on the detective's radar, figuratively speaking, as a suspect.  Initially, the police did not follow up on the petitioner because they believed Ms. Perez was referring to Lonny Price, Jr. who was incarcerated on the night in question.  After they interviewed Ms. Perez at approximately 9:40 a.m., they learned that there was an Alonzo Price, Sr. and looked into his criminal record.

They spoke with an Ocean County police officer regarding an arrest of the petitioner in Ocean City in 1989 and learned that the crime committed in 1989 was similar to the crimes committed on June 22nd and 29th.  The defense – the defendant allegedly broke into the apartment of a female neighbor after posing as a police officer, sexually assaulting her, tying her up and then stealing her jewelry.

After learning this, detectives proceeded to proceed and interview Christopher Turner, a person named as Ms. Hamer as a possible suspect.  He was questioned as to the assault on Ms. Hamer and stated that he heard rumors that Lonny Price was a suspect though denied any direct knowledge.

The petitioner was thereupon arrested on June 29 of 2000.  As a result, even before the arrest, the police had information which led them to suspect the petitioner as the perpetrator of this offense. And even without the arrest, p – law enforcement would mostly have undertaken the same investigation and proceeded – as

proceeded after the interview with the petitioner.  Specifically, attempt to speak with Pat Jones, the petitioner's landlord at that time, which led to their interview of Lisa Jones, which then led the police speaking et cetera.

As petitioner was already was already on the police radar – again, figuratively speaking – they probably would have located his residence and begun speaking with him and others about his whereabouts on the night in question just as they did with Christopher Jones. . . .

[H]ere the subsequent search of petitioner's home was not undertaken pursuant to an exception to the warrant requirement and subsequent search therefore was not tainted by illegal arrest. Here, the search of the petitioner's home appears to have been undertaken following an application for a search warrant was made and granted.

This occurred after the illegal arrest with the affidavit with in support of the search warrant was not based on anything obtained from the petitioner as a result of his illegal arrest.  The search warrant that was issued and which lead to the discovery of the jean shorts, gray tee shirt, carpet threats was based on the following.

First, details of the crime committed on June 22, 2000.

Second, information provided to Detective Skull by Michael Tony, Ms. Hamer's adult son.  That Alonzo or Lonny Price was a possible suspect because he knew Price and felt that he fit the suspect's description.

Three, the details of the second crime committed on Jun 29, 2000 including Ms. Perez's identification of the voice as that of Alonzo/Lonny Price and her reasons for believing the voice was that of the defendant and the fact that despite her believe, quote, "She could not definitely,"  -- "She could not say definitely that she was positive that it was Alon" – "that it was Alonzo Price." Close quote.

Fourth, a recitation of the use of police dogs to follow the assailant's trail and the conclusion that based on the way the dogs followed the trail, the assailant had been riding a bike.

Fifth, the similarity between the two crimes as specifically relates to the method of entry, actions, comments made by the suspect, tying up of both victims in almost the same way.

Sixth, a check of the criminal background of the defendant which revealed he had 12 arrests including kidnap, sexual assault, burglary, theft, weapons offenses and drug offenses.

Seventh, a description of the defendant's appearance as the detectives were arresting him. The defendant had very short facial and head hair, strong odor of cigarettes, all consistent with Mrs. Perez's description.

Finally, the interview with Lisa Jones who also rents a room in the same home as the defendant which revealed that she had lent the defendant her bike sometime after midnight on June 28th and that the bike was returned sometime before she woke up on the 29th.

Further described was Ms. Jones' statements regarding a robbery in Woodbine where a woman had been tied up and that she had heard that the defendant was responsible of this crime though she could not say what the source the information was or if it were true, but she became concerned because she knew the defendant was out of his apartment using her bike during the time the second crime occurred.

All but the last of these items, the interview with Ms. Jones, was evidence obtained by the police before they arrested the defendant. And it is therefore clear that the voice identification at the police barracks was not part of the facts used in the affidavit for the search warrant. The suppression of the search – of the fruits of the search warrant – even if one disregarded the interview with Ms. Jones – sufficient, in this Court's view, to have supported a finding of probable cause as was the case.

The Court in *State v. Worthy* set forth the following regarding illegal searches and the exception to the exclusionary rule.

And I quote at 100 N.J. Reports at pages 238, a 1985 decision specifically, "In *State v. Sugar*," – cited omitted – "this Court adopted an inevitable discovery exception to the judicially created exclusionary rule applicable to an unreasonable search and seizure. The exception applied when: 1. Proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; 2. Under all of the surrounding relevant circumstances, the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and 3. The discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means."

58

"The Court ruled in *Sugar* that the State must show by clear and convincing evidence that had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence wholly apart from its unlawful acquisition." . . . .

The Court in *Worthy* held that the inevitable discovery exception did not apply to the facts of that case noting, quote, "Courts must be extremely careful not to apply the inevitable discovery rule upon the basis of nothing more than a hunch or speculation as to what otherwise might have occurred."

Prior to the April 19 of 1991 conversation, there was no indication that any other independent investigative process would have resulted in the interception of the conversations and the result of the – and the arrest – excuse me – of the defendants in the hotel in Vineland on June 12.  It was during the course of the illegally recorded conversations that Worthy and the informant agreed on the essential elements of the transaction; quantity, price, method of payment and the tentative dates the deal would be completed.

As the trial court noted, the State, quote, "may have gotten John Worthy on something, someday, somewhere if they continued investigating him, but I'm not convinced that they would have ever gotten to this deal with these 30 pounds of marijuana in this hotel room on June 12, 1991, and I'm not thoroughly convinced of that,"

The case here is unlike those facts in *Worthy*.  As I've pointed out, even without the illegal arrest of the defendant, the factors the State concedes, defendants [sic] would have questioned the defendant and others connected to the defendant as they questioned Christopher Turner and Mr. Turner's girlfriend after Mr. Turner was named as a possible suspect. . . .

Further, even without the interview of Lisa Jones, there was enough in the affidavit, in this Court's view, to support a finding of probable cause.  As such, the evidence obtained as a result of the valid search warrant is not tainted by the illegal arrest.

As petitioner has therefore failed to show, there is a reasonable property [sic] that but for trial counsel failing to move to suppress the fruits of this search, is tainted by the illegal arrest or to challenge the validity of the arrest that the outcome of the case would have been different.

(Dkt. No. 10-16 at p. 27-31 (internal citations omitted).)

The state court's denial was not an unreasonable application of *Strickland*.  The state court determined that the motion to suppress would have been denied such that there was no reasonable probability that the outcome of the proceeding would have been different.  Indeed, as the state court noted, much of the evidence giving rise to the search of petitioner's dwelling (in which key evidence used at trial was seized) was discovered before and independent of petitioner's subsequent arrest.  Accordingly, petitioner failed to show to that the state court unreasonable applied *Strickland*'s prejudice prong by finding that petitioner had failed to show to a reasonable probability that the outcome of his proceeding would have been different.  Thus, this Claim does not merit granting federal habeas relief.

L.  Claims XII & XIII – Failure to Conduct Evidentiary Hearing During PCR Proceedings

In Claims XII and XIII, petitioner asserts that the PCR court erred in denying his PCR petition without first conducting an evidentiary hearing.  According to petitioner, he made a prima facie showing that his Fourteenth Amendment right to a fair trial was violated.  Furthermore, petitioner claims that he should have been awarded an evidentiary hearing during the PCR proceedings because trial counsel failed to suppress the cigarette butt due to a lack of chain of custody and because the detective lied about what he did with this evidence.  (*See* Dkt. No. 1 at p. 9.)

As previously noted, petitioner is entitled to federal habeas relief for violations of the Constitution, laws or treaties of the United States.  *See* 28 U.S.C. § 2254(a).  Thus, claims based on state law error are not cognizable.  *See Estelle*, 502 U.S. at 67-69.  Furthermore, "the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation."  *Hassine v.*

*Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998); *see also Lambert v. Blackwell*, 387 F.3d 210, 247

(3d Cir. 2004) ("[H]abeas proceedings are not the appropriate forum for Lambert to pursue

claims of error at the PCRA proceeding."). Thus, petitioner's claim that he should have obtained

an evidentiary hearing in his PCR proceedings before the state courts is not properly before this

Court as a habeas claim. *Accord Davis v. New Jersey*, No. 12-5748, 2014 WL 2615657, at *17

(D.N.J. June 12, 2014); *Vreeland v. Warren*, No. 11-5239, 2013 WL 1867043, at *4 n.2 (D.N.J.

May 2, 2013). Accordingly, petitioner is not entitled to federal habeas relief on this claims that

the PCR court should have conducted an evidentiary hearing.

    M. Petitioner's Traverse

        Petitioner appears to raise a new claim in his Traverse. He asserts in his traverse that the

search warrant issued lack probable cause. At the outset, the propriety of petitioner bringing this

new claim in his traverse which was filed more than one year after the New Jersey Supreme

Court denied certification on his PCR petition is questionable. *See Ryan v. Hendricks*, No. 04-

4447, 2014 WL 268578, at *3 n.4 (D.N.J. Jan. 23, 2014) (explaining court will not consider new

claims brought in reply in support of habeas petition where petitioner was provided with required

*Mason v. Myers*, 208 F.3d 414 (3d Cir. 2000) notice made no effort to timely amend the

petition). However, even if such a claim was properly before this Court, petitioner still would

not be entitled to federal habeas relief on this issue. In *Stone v. Powell*, 428 U.S. 465 (1976), the

United States Supreme Court held that, "where the State has provided an opportunity for full and

fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas

corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was

introduced at trial." *Id.* at 494. This bar applies whether or not the claim is potentially

meritorious. *See Deputy v. Taylor*, 19 F.3d 1485, 1491 (3d Cir. 1994).

Petitioner gives no indication that he did not have a full and fair opportunity to litigate this Fourth Amendment claim in the state courts.  Thus, he fails to show that he is entitled to federal habeas relief on this claim, even if it is was properly raised before this Court.

N. Request for a Stay

Petitioner has also filed a request for a temporary stay of these proceedings.  (*See* Dkt. No. 18.)  The entirety of his request is as follows:

> I would like to request that I be allowed a Temporary Stay regarding your pending decision on my petition for writ of habeas corpus.  There are several issues that I have failed to address on the trial level, and I would appreciate the chance to have them heard in the appropriate court.  [¶]  I am referring to a fourth amendment violation, discovery violation, identification issue, and an illegal sentence violation.

(*Id.*)  Thus, it appears as if petitioner seeks a stay so that he can exhaust unexhausted claims.

A state prisoner applying for a writ of habeas corpus under § 2254 in federal court must first "exhaust[ ] the remedies available in the courts of the State," unless "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1); *see also Rose v. Lundy*, 455 U.S. 509, 515 (1982).  A petitioner must exhaust state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in collateral post-conviction relief proceedings.  *See, e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) (announcing the rule "requiring state prisoners to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this

section, if he has the right under the law of the State to raise, by any available procedure, the question presented.").

Recognizing the complexities that face prisoners who must exhaust state remedies while complying with the one-year statute of limitations period for § 2254 habeas petitions as set out in § 2244(d)(1), the United States Court of Appeals for the Third Circuit has held that "[s]taying a habeas petition pending exhaustion of state remedies is a permissible way to avoid barring from federal court a petitioner who timely files a mixed petition [containing both exhausted and unexhausted claims]." *Crews v. Horn*, 360 F.3d 146, 151 (3d Cir. 2004). Indeed, the Third Circuit has stated that "when an outright dismissal could jeopardize the timeliness of a collateral attack, a stay is the only appropriate course of action." *Id.* at 154.

Since *Crews*, however, the United States Supreme Court has explained when a stay should be issued; specifically:

> stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines that there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. . . .
>
> [I]t likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.

*Rhines v. Weber*, 544 U.S. 269, 277-78 (2005).

In this case, petitioner's request for a stay is devoid of any argument illustrating "good cause" for why he has failed to exhaust these general admittedly unexhausted claims.

63

Furthermore, his stay request is completely lacking with respect to the specifics of these claims to show that they are potentially meritorious.  Therefore, this Court will deny petitioner's request for a stay.

O.  Petitioner's Request to Amend Habeas Petition

Petitioner has also filed a motion to amend his habeas petition.  (*See* Dkt. No. 24.)  In the request, petitioner seeks to add a claim that counsel was ineffective in failing to object to a jury instruction given by the trial judge.  The jury instruction given to the jury that is at issue was as follows:

> As you know, Mr. Price elected not to testify at trial.  It is his constitutional right to remain silent.  You must not consider for any purpose or in any manner in arriving at your verdict the fact that he did not testify.  That fact should not enter into your deliberations or discussions in any manner at any time.  Mr. Price is entitled to have the Jury consider all the evidence presented at trial.  He's presumed innocent even if he chooses not to testify.

(Dkt. No. 10-12 at p. 5.)  While Federal Rule of Civil Procedure 15 states that leave to amend should be freely given, the motion may be denied where there is undue delay, bad faith, dilatory motive, unfair prejudice, or futility of amendment.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

Generally, claims involving jury instructions in state criminal trials are matters of state law and are cognizable only if the instructions are so fundamentally unfair that they deprive a petitioner his rights to a fair trial and due process.  *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Petitioner appears to argue that the above listed jury instruction left the jury with the impression that the petitioner had an obligation to answer to the charges by testifying in his own defense.  However, this Court gleans nothing from the jury instructions, when read in full, that

would give the jury such an impression.  Indeed, the trial court specifically instructed the jury

that petitioner had the right to remain silent and that his choice to remain silent should not enter

into their deliberations in any way whatsoever.  Accordingly, as the proposed claim by petitioner

is meritless, his request to amend his habeas petition to add this claim would be futile such that

the request to amend will be denied.

### P.  Petitioner's Motion to Compel

Petitioner has filed a renewed motion to compel.  (*See* Dkt. No. 29.)  In the motion,

petitioner requests that the Court order respondent to supply a copy of petitioner's arrest warrant.

Petitioner previously sought to have this Court compel respondent to produce the arrest warrant.

In denying that first motion to compel without prejudice, this Court stated that respondent

admitted that the arrest warrant was invalid.  Furthermore, the Court explained it appeared that

the actual arrest warrant would not be necessary to decide petitioner's claims.  (*See* Dkt. No. 28

at p. 1.)  The same holds true now for the reasons discussed *supra* why petitioner's ineffective

assistance of counsel claims related to the arrest warrant do not merit federal habeas relief.

Accordingly, the renewed motion to compel will be denied.

### Q.  Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of

appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. §

2254.  A certificate of appealability may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies

this standard by demonstrating that jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003).  Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## V.    CONCLUSION

For the foregoing reasons, petitioner's habeas petition will be denied and a certificate of appealability shall not issue.  Furthermore, petitioner's request for a stay and motion to compel will be denied.  An appropriate order will be entered.


DATED:  June 25,2015

                                              s/Robert B. Kugler
                                              ROBERT B. KUGLER
                                              United States District Judge